**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 99-30421

AT&T COMMUNICATIONS

Plaintiff - Appellant

v.

BELLSOUTH TELECOMMUNICATIONS INC; LOUISIANA PUBLIC SERVICE
COMMISSION; DON OWEN; IRMA MUSE DIXON; DALE SITTIG; JAMES M
FIELD; JACK A BLOSSMAN; COMMISSIONER OF LOUISIANA PUBLIC SERVICE
COMMISSION, in their official capacities

Defendants - Appellees

_____

AT&T COMMUNICATIONS OF THE SOUTH CENTRAL STATES, INC, also known
as AT&T

Plaintiff - Appellant

v.

BELLSOUTH TELECOMMUNICATIONS INC; LOUISIANA PUBLIC SERVICE
COMMISSION; DON OWEN, The Commissioners of the Louisiana Public
Service Commissioners in their Official Capacity; IRMA MUSE
DIXON, The Commissioners of the Louisiana Public Service
Commissioners in their Official Capacity; DALE SITTIG, The
Commissioners of the Louisiana Public Service Commissioners in
their Official Capacity; JAMES M. FIELD, The Commissioners of the
Louisiana Public Service Commissioners in their Official
Capacity; JACK A. BLOSSMAN JR, The Commissioners of the Louisiana
Public Service Commissioners in their Official Capacity

Defendants - Appellees

_____

AMERICAN COMMUNICATION SERVICES OF LOUISIANA, INC; AMERICAN
COMMUNICATION SERVICES OF BATON ROUGE, INC; AMERICAN

COMMUNICATION SERVICES OF SHREVEPORT, INC

Plaintiffs - Appellants

v.

BELLSOUTH TELECOMMUNICATIONS INC; THE LOUISIANA PUBLIC SERVICE COMMISSION; DON OWEN; IRMA MUSE DIXON; DALE SITTIG; JAMES M. FIELD; JACK A. BLOSSMAN also known as Jay Blossom; COMMISSIONERS OF THE LOUISIANA PUBLIC SERVICE COMMISSION, in their official capacities

Defendants - Appellees

Appeals from the United States District Court
For the Middle District of Louisiana

January 16, 2001

Before POLITZ, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The issues in this case are (1) whether a telecommunications carrier is barred by the Eleventh Amendment from bringing suit in federal district court against a state public service commission under Section 252 (e)(6) of the Telecommunications Act of 1996, 47 U.S.C. § 151, et seq. (1996 Act or Act), for judicial review of whether the commission's arbitration determination with respect to an interconnection agreement meets the requirements of § 151 of the Act and applicable FCC regulations; and (2) whether the carrier may bring an action under the Ex parte Young doctrine in federal court against the individual members of a state public service commission in their official capacities for prospective relief from their

2

arbitration determination contrary to the requirements of § 251 of the Act and its implementing regulations.[1]  The district court held that the plaintiff telecommunications carriers were barred by Eleventh Amendment immunity from bringing such actions and dismissed their suits.  We reverse and remand the case for further proceedings in accordance with the 1996 Act and the Ex parte Young doctrine.

In the 1996 Act Congress pre-empted the states in the regulation of local telecommunications competition with regard to all matters addressed by the Act.  The Act offers state public service commissions the option, however, of approving or rejecting, pursuant to §§ 251 and 252 of the Act, any interconnection agreement between carriers adopted by negotiation or arbitration.  If the state public service commission declines such offer in any proceeding under the Act, the FCC is required to assume the

---

[1]AT&T also contends that the Eleventh Amendment is not applicable because the present case involves mere judicial review of the record and is not a suit in law or equity against the Louisiana Public Service Commission ("LPSC") for purposes of the Eleventh Amendment.  We do not accept this argument.  In the present case AT&T Communications named the LPSC as a defendant, process was served on it, and it was required to suffer the indignity of being compelled to appear before a federal court.
A "suit in law or equity" exists against a sovereign state for purposes of the Eleventh Amendment when a plaintiff has served compulsory process upon that state as defendant in a matter.  See Missouri v. Fiske, 290 U.S. 18, 28 (1833); Cohens v. Virginia, 19 U.S. 264, 407-408 (1821).  See also Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) ("The very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.") (citing In re Ayers, 123 U.S. 443, 505 (1887)) (emphasis added).

responsibility of acting upon that matter. In a case in which the state public service commission accepts the responsibility offered and makes a determination under the Act, any party aggrieved by such determination may bring an action in an appropriate federal district court to determine whether the agreement meets the requirements of §§ 251 and 252. The 1996 Act provides that no state court shall have jurisdiction to review the action of a state commission in approving or rejecting an agreement under the Act.

When the Louisiana Public Service Commission (LPSC) accepted Congress's offer to function as an arbitrator under the Act in determining and approving the interconnection agreement in the present case, the regulation of local telecommunications competition and related interconnection agreements was no longer a permissible or lawful activity within the states' own powers. When Congress bestows a gift or gratuity upon a state of a benefit which cannot be obtained by the state's own power, Congress may attach to the gratuity the condition of a voluntary waiver by the state of its Eleventh Amendment immunity. Consequently, the LPSC voluntarily waived its state immunity when it accepted the Congressional offer of a gratuity that was clearly conditioned upon the LPSC's amenability to federal suits by private parties under the Act and arbitrated the interconnection dispute in the present case.[2]

---

[2] In this opinion, for convenience and hopefully some clarity, we refer to all of the parties and non-parties which have adopted

4

The LPSC commissioners allegedly determined and approved an interconnection agreement that violates the requirements of the 1996 Act, and the aggrieved carriers bound by the determination seek prospective injunctive relief against the commissioners in their official capacities to terminate further operation of the agreement against them; therefore, the doctrine of Ex parte Young permits the suit to proceed against the commissioners.

## I.   The Telecommunications Act of 1996

### A. Background; Preemption of State Regulatory Jurisdiction

In AT&T Corp. v. Iowa Utilities Board, 525 U.S. 366, 371-373 (1999), the Supreme Court succinctly described the context and content of the 1996 Act:

> Until the 1990s, local phone service was thought to be a natural monopoly.  States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network.  Technological advances, however, have

the position on appeal of plaintiff-appellant AT&T Communications collectively as "AT&T."  This includes plaintiff-appellant American Communications of Louisiana; defendant-appellant  BellSouth; the United States and the Federal Communications Commission ("FCC"), intervenors; and Amicus Curiae Sprint Communications Company.  In certain instances we refer to AT&T Communications and American Communications of Louisiana jointly as "AT&T Communications."

AT&T Communications and American Communication Services of Louisiana also appeal from the district court's determination that the LPSC is an indispensable party to this litigation.  Our reversal of the district court's judgment moots the indispensable party issue.

made competition among multiple providers of local service seem possible, and Congress recently ended the longstanding regime of state-sanctioned monopolies.

[The 1996 Act] fundamentally restructures local telephone markets. States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry. Foremost among these duties is the LEC's obligation under 47 U.S.C. § 251(c) (1994 ed., Supp. II) to share its network with competitors. Under this provision, a requesting carrier can obtain access to an incumbent's network in three ways: It can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of the incumbent's network "on an unbundled basis"; and it can interconnect its own facilities with the incumbent's network. When an entrant seeks access through any of these routes, the incumbent can negotiate an agreement without regard to the duties it would otherwise have under § 251(b) or (c). See § 252(a)(1). But if private negotiation fails, either party can petition the state commission that regulates local phone service to arbitrate open issues, which arbitration is subject to § 251 and the FCC regulations promulgated thereunder.

(footnotes omitted).

The FCC issued its First Report and Order implementing local competition provisions under the 1996 Act six months after its passage. In Re Implementation of the Local Competiton Provisions in the Telecommunications Act of 1996, 11 FCC Rcd 15499 (1996) (First Report & Order). Numerous challenges to the FCC's rulemaking by incumbent LECs and state utility commissions were consolidated in the Eighth Circuit. The Court of Appeals vacated the FCC's pricing rules and several other aspects of the First Report and Order, as reaching beyond the Commission's jurisdiction. Iowa Utilities Board v. FCC, 120 F.3d 753, 800, 804, 805-806 (8th Cir. 1997). It held that the general rulemaking authority

6

conferred upon the FCC by the Communications Act of 1934 extended only to interstate matters, and that the FCC therefore lacked the specific congressional authorization it needed for implementing provisions of the 1996 Act addressing intrastate communications. Id. at 795.

The Supreme Court in Iowa Utilities reversed on the main point, holding that the FCC has general jurisdiction to implement the 1996 Act's local-competition provisions. The Court concluded that since Congress expressly directed that the 1996 Act be inserted into the Communications Act of 1934, and since the 1934 Act already provides that the FCC "may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act," 47 U.S.C. § 201(b), the FCC's rulemaking authority extends to implementation of §§ 251 and 252. "We think that the grant in § 201(b) means what it says: The FCC has rulemaking authority to carry out the 'provisions of this Act,' which include §§ 251 and 252, added by the Telecommunications Act of 1996." Id. at 378. Furthermore, the Court held that section 152(b) of the Communications Act of 1934, which provides that "nothing in this chapter shall be construed to apply or to give the [FCC] jurisdiction with respect to . . . intrastate communications service . . ." does not change this conclusion because the 1996 Act clearly applies to intrastate matters. Id. at 379-380.

Significantly for purposes of deciding the Eleventh Amendment issues in the present case, the Court in Iowa Utilities, in answer

7

to arguments of the dissenters relying on the presumption against preemption of state regulatory power, responded that the 1996 Act clearly manifested Congress's intent to supplant traditional state police power regulation of local telecommunications competition:

> But the question in this case is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to matters addressed by the 1996 Act, it unquestionably has. The question is whether the state commissions' participation in the administration of the new federal regime is to be guided by federal-agency regulations. If there is any "presumption" applicable to this question, it should arise from the fact that a federal program administered by 50 independent state agencies is surpassing strange. The appeals by both Justice THOMAS and Justice BREYER to what might loosely be called "States' rights" are most peculiar, since there is no doubt, even under their view, that if the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel. This is, at bottom, a debate not about whether the States will be allowed to do their own thing, but about whether it will be the FCC or the federal courts that draw the lines to which they must hew. To be sure, the FCC's lines can be even more restrictive than those drawn by the courts–but it is hard to spark a passionate "States' rights" debate over that detail.

Id. at 378 n.6 (emphasis added). "After the 1996 Act, § 152(b) [§ 2(b) of the 1934 Act, which excluded intrastate communications from the FCC's jurisdiction] may have less practical effect. But that is because Congress, by extending the Communications Act into local competition, has removed a significant area from the States' exclusive control." Id. at 381 n.8 (emphasis added). See also Texas Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 423-24 (5th Cir. 1999), cert granted, 120 S.Ct. 2214 (2000)(recognizing Iowa Utilities' holding that state regulation of intrastate

8

telecommunications competition is preempted under §§ 251 and 252 but refusing to extend that holding to § 254 of the Act).

      B.    Procedures Under the 1996 Act; Optional Role Of
State Commissions; FCC Preemption; Federal Judicial Review

Upon receiving a request for interconnection, services, or network elements pursuant to Section 251 of the Act, an incumbent LEC may negotiate and enter into a binding agreement with the requesting carrier which must be submitted to the state commission. § 252(a)(1). During negotiations, any party may ask the state commission to mediate differences. § 252(a)(2). Any party to the negotiation may petition a state commission to arbitrate any open issues during the period from the 135th to the 160th day after the initial request for negotiation. § 252(b)(1). The state commission resolving open issues by arbitration must ensure that its resolution and imposition of conditions meets the requirements of § 251 and FCC regulations. § 252(c). The state commission may only reject an agreement adopted by negotiation if it discriminates against a non-party carrier; is not consistent with the public interest, convenience, and necessity; or does not meet the requirements of §§ 251 and 252(d) and FCC regulations. § 252(e)(2). Subject to § 253, the state commission may also establish or enforce other requirements of state law in its review of an agreement. § 252(e)(3). No state court shall have jurisdiction to review the action of the state commission in approving or rejecting an agreement under this section. Id. If

9

the state commission fails to act or to carry out its responsibility under § 252(e), the FCC shall issue an order preempting the state commission's jurisdiction of that proceeding or matter, assume the responsibility offered to the commission with respect to that matter, and perform the functions that had been offered to the state commission. § 252(e)(5). "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." § 252(e)(6).

## II. Facts and Procedural History

In 1997 AT&T Communications attempted to negotiate an interconnection agreement under §§ 251 and 252 of the 1996 Act with BellSouth, the local exchange carrier in Louisiana. When the parties failed to reach an agreement on several elements of the interconnection agreement, AT&T Communications petitioned the LPSC to arbitrate the issues pursuant to § 252(b). LPSC accepted the responsibility as arbitrator under § 252(e)(4) and resolved the issues substantially in BellSouth's favor. AT&T Communications brought this action against BellSouth, the LPSC, and the individual commissioners of the LPSC in the Middle District of Louisiana pursuant to § 252(e)(6), contending that the LPSC arbitration determination does not meet the requirements of §§ 251 and 252 and

10

the FCC regulations.  The defendants answered on the merits.  The district court, however, requested that the parties brief whether the suits against the LPSC and its officers were barred by the Eleventh Amendment.  After briefing, the district court dismissed the actions as to all defendants, holding that suit against the LPSC was barred by the Eleventh Amendment, and that suit against the individual commissioners could not be maintained under Ex parte Young.  AT&T Communications of the South Central States, Inc. v. BellSouth Telecommunications, Inc., 43 F. Supp. 2d 593 (M.D.La. 1999).  AT&T filed timely notices of appeal.

## III.  Discussion

AT&T presents two principal arguments for reversal of the district court's interpretation and application of the Eleventh Amendment and Ex parte Young: (1) the LPSC waived its Eleventh Amendment immunity by voluntarily accepting and performing its assigned role in the federal regulation of local competition under the 1996 Act; and (2) AT&T's suit, in any event, may proceed against the individual commissioners under the doctrine of Ex parte Young.

Whether a state is entitled to Eleventh Amendment immunity is a question of law that this court reviews de novo.  Hudson v. City of New Orleans, 174 F.3d 677, 682 (5th Cir. 1999); United States ex rel. Foulds v. Texas Tech Univ., 171 F.3d 279, 288 (5th Cir. 1999), cert. denied, 120 S.Ct. 2194 (2000).

11

A.  State Sovereign Immunity Generally

The Eleventh Amendment to the Constitution of the United States provides:  "The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Further, as long construed by the Supreme Court, federal judicial power does not extend to suits brought against a state or its agencies by its own citizens.  See, e.g., Puerto Rico Aqueduct & Sewer Auth. V. Metcalf & Eddy, 506 U.S. 139 (1993); Edelman v. Jordan, 415 U.S. 651 (1974); Hans v. Louisiana, 134 U.S. 1 (1890). The Eleventh Amendment also bars federal jurisdiction over suits against state officials acting in their official capacities when the state is the real party in interest.  See, e.g., Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984).

Eleventh Amendment immunity from suit is not absolute. College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 670 (1999).  Congress may authorize a private party to bring a federal court suit against unconsenting states in the exercise of its power to enforce the Fourteenth Amendment.  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 80 (2000); College Savings, 527 U.S. at 670 (citing Fitzpatrick v. Bitzer, 427 U.S. 445 (1976)).  A state may waive its sovereign immunity by consenting to suit.  College Savings, 527 U.S. at 670 (citing Clark v. Barnard, 108 U.S. 436, 447-448 (1883)).

12

Additionally, the Supreme Court has for nearly a century allowed suits against state officials for prospective injunctive relief to end a continuing violation of federal law under the doctrine of Ex parte Young, 209 U.S. 123 (1908).

In Seminole Tribe v. Florida, 517 U.S. 44, 72 (1996), the Supreme Court held that Congress cannot abrogate Eleventh Amendment immunity through the exercise of its Article I powers. "Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." Id. at 72; see College Savings, 527 U.S. at 672. Consequently, AT&T correctly does not contend that Congress abrogated the states' Eleventh Amendment immunity by enactment of the 1996 Act under its Article I power to regulate interstate commerce. Instead, this case turns on waiver and Ex parte Young.

### B. Waiver

The Supreme Court has "long recognized that a State's sovereign immunity is 'a personal privilege which it may waive at [its] pleasure.'" College Savings, 527 U.S. at 675 (quoting Clark, 108 U.S. at 447). "The decision to waive that immunity, however, 'is altogether voluntary on the part of the sovereignty.'" Id. (quoting Beers v. Arkansas, 61 U.S. 527, 529 (1858)). Generally, the Court will find a waiver either if the state voluntarily invokes its jurisdiction, Gunter v. Atlantic Coast Line R.R. Co., 200 U.S. 273, 284 (1906), or if the state makes a "clear

13

declaration" that it intends to submit itself to the court's jurisdiction. College Savings, 527 U.S. at 675-76 (quoting Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 54 (1944)).

In College Savings, the Court held that the Eleventh Amendment immunity of the state education expense board ("the Board"), an arm of the State of Florida, had not been voluntarily waived by the Board's alleged false advertising in interstate commerce. 527 U.S. at 680-81. The petitioner, a New Jersey bank, had brought suit against the Board alleging unfair competition under the Lanham Act based on the Board's alleged false advertising of its tuition savings plans in its brochures and annual reports. The pertinent federal statutes, the Trademark Remedy Clarification Act and the Lanham Act, expressly subjected the states to suits brought under them for false and misleading advertising.

The New Jersey bank relied upon Parden v. Terminal Railway of Alabama Docks Department, 377 U.S. 184 (1964), in which the Supreme Court had recognized a not altogether volitional "constructive-waiver" theory, when it permitted employees of a railroad owned and operated by Alabama to bring an action under the FELA against the State as their employer. Although the FELA did not refer to the states, the Parden Court held that, under the facts of that case, the Act authorized the FELA action against Alabama as a "common carrier by railroad . . . engaging in commerce between . . . the several States," 45 U.S.C. § 51 (1940 ed.). See College Savings, 527 U.S. at 666-67. Even though Alabama law expressly disavowed

14

any such waiver, the Parden majority held that "[b]y enacting the [FELA] . . . Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit." Parden, 377 U.S. at 192.

The Supreme Court in College Savings, however, expressly overruled Parden and its "constructive-waiver experiment [as] ill conceived." 527 U.S. at 680. The Court stated that "there is little reason to assume actual consent based upon the State's mere presence in a field subject to congressional regulation[;] . . . the most that can be said . . . is that the State has been put on notice that Congress intends to subject it to suits brought by individuals[,] . . . [and][t]hat is very far from concluding that the State made an 'altogether voluntary' decision to waive its immunity." Id. at 680-681 (quoting Beers, 61 U.S. at 529). More is required as a reasonable basis for inferring that the state, by engaging in a federally-regulated activity, voluntarily consented to being sued by individuals in federal court based on the federal law. See id.

Consequently, the College Savings Court concluded that a state voluntarily waives its Eleventh Amendment immunity by engaging in activity subject to congressional regulation only if (1) the state has been put on notice clearly and unambiguously by the federal

15

statute that the state's particular conduct or transaction will subject it to federal court suits brought by individuals; (2) the state may refrain from engaging in the particular actions without excluding itself from activities otherwise lawfully within its powers; and (3) the state elects to engage in the conduct or transaction after such legal notice has been given. See 527 U.S. at 675-87. These waiver requirements are most clearly illustrated by the Court's discussion of the fundamental differences between College Savings and two prior cases involving constitutionally permissible conditions attached to gratuities offered to the states by Congress.

In Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275 (1959), the Court had held "that a bistate commission which had been created pursuant to an interstate compact (and which we assumed partook of state sovereign immunity) had consented to suit by reason of a suability provision attached to the congressional approval of the compact." College Savings, 527 U.S. at 686. And in such cases as South Dakota v. Dole, 483 U.S. 203 (1987), the Court had held "that Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the action." College Savings, 527 U.S. at 686.

The fundamental difference between the College Savings case and the Petty and Dole cases, as the Court cogently pointed out,

16

lies in the distinction between the types of Congressional acts involved.  In the statutes involved in the latter cases, Congress had obtained the states' voluntary consent to conditions attached to gratuities–a voluntary waiver of sovereign immunity for an interstate compact in <u>Petty</u>, and an increase in the drinking age for federal highway funds in <u>Dole</u>.  Neither gratuity was attainable by the state through lawful activities within the state's own powers.  In contrast, <u>College Savings</u> involved federal statutes that forced a state's not "altogether voluntary" waiver by threat of exclusion from otherwise lawful activity within its power.  The Court explained:

> These cases seem to us fundamentally different from the present one.  Under the Compact Clause, U.S. Const., Art. I, § 10, cl. 3, States cannot form an interstate compact without first obtaining the express consent of Congress; the granting of such consent is a gratuity.  So also, Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts.  In the present case, however, what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction: exclusion of the State from otherwise permissible activity.  Justice BREYER's dissent acknowledges the intuitive difference between the two, but asserts that it disappears when the gift that is threatened to be withheld is substantial enough.  Perhaps so, which is why, in cases involving conditions attached to federal funding, we have acknowledged that "the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'"  <u>Dole</u>, supra, at 211, 107 S.Ct. 2793, quoting from <u>Steward Machine Co. v. Davis</u>, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).  In any event, we think where the constitutionally guaranteed protection of the States' sovereign immunity is involved, the point of coercion is automatically passed–and the voluntariness of waiver destroyed–when what is attached to the refusal to waive is the exclusion of the State from otherwise

17

lawful activity.

527 U.S. at 686-87.

For these reasons, we agree with the Tenth and Seventh Circuits' conclusion that, after College Savings, Congress may still obtain a non-verbal voluntary waiver of a state's Eleventh Amendment immunity, if the waiver can be inferred from the state's conduct in accepting a gratuity after being given clear and unambiguous statutory notice that it was conditioned on waiver of immunity.  See MCI Telecommunications Corp. v. Illinois Bell Tel. Co., 222 F.3d 323, 339 (7th Cir. 2000) (In College Savings, 527 U.S. at 687, "the Court simply held that states cannot 'constructively' waive their immunity by being forced by Congress to choose between preserving their sovereign immunity and engaging in an 'otherwise lawful activity.'"); MCI Telecommunications Corp. v. Pub. Serv. Comm'n of Utah, 216 F.3d 929, 937 (10th Cir. 2000) ("A constructive waiver is voluntary only where Congress threatens a state with the denial of a 'gift or gratuity' if the state refuses to consent to suit in federal court.  Where Congress threatens a state with a 'sanction' if it refuses to consent to suit, then the waiver is no longer freely given.") (citation omitted).  A state's voluntary waiver of immunity, inferred from the state's acceptance of a Congressional gratuity that it was free to decline without loss of any sovereign prerogative, was distinguished by the Supreme Court in College Savings from "the  type of 'forced waiver' exacted by Congress under Parden, whereby the state is threatened with the

18

sanction of waiving its immunity if it engages in a regulated enterprise, [as] really an abrogation of the state's immunity prohibited by Seminole Tribe." Illinois Bell, 222 F.3d at 340 (citing College Savings, 527 U.S. at 690 as "noting that forced waiver and abrogation are 'the same side of the same coin'"); (citing also Chavez v. Arte Publico Press, 204 F.3d 601, 604 n.5 (5th Cir. 2000) ("College Savings expressly overruled Parden and its implied waiver theory. That theory is no longer available to support an Article I abrogation of Eleventh Amendment Immunity.")).

We also join the Seventh and Tenth Circuits in concluding that the 1996 Act does not potentiate the exaction of a "forced waiver" of Eleventh Amendment immunity from the states. See Illinois Bell, 222 F.3d at 342-44; Pub. Serv. Comm'n, 216 F.3d at 938-39, 939 n.6. The Act only establishes a basis for a voluntary gratuity induced waiver that states may accept or reject, and it does not require the states as a condition of accepting the gratuity to abandon any lawful activity currently within their powers. Illinois Bell, 222 F.3d at 343-344; Pub. Serv. Comm'n, 216 F.3d at 938.

After passage of the 1996 Act, regulation of competition among providers of local phone service is no longer within the province of states' inherent authority. Congress, by enacting the 1996 Act pursuant to its commerce power, validly preempted the states' power to regulate local telecommunications competition. Iowa Utilities, 525 U.S. 366, 378 n.6 (1999) ("With regard to the matters addressed by the 1996 Act, [the Federal Government] unquestionably has [taken

19

the regulation of local telecommunications competition away from the States].”); see also FERC v. Mississippi, 456 U.S. 742, 764 (1982) (“[T]he commerce power permits Congress to pre-empt the States entirely in the regulation of private utilities.”). Accordingly, Congress established a federal system headed by the FCC to regulate local telecommunications competition. The Act permissibly offers state regulatory agencies a limited mission, which they may accept or decline: to apply federal law and regulations as arbitrators and ancillary regulators within the federal system and on behalf of Congress. 42 U.S.C. § 252. Cf. Hodel v. Virginia Surface Mining & Reclamation Assn., 452 U.S. 264, 290 (1981) (“Thus, Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining. We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role.”).

Section 252(e)(6) of the Act plainly states that “any party aggrieved by” a state commission’s determination, which necessarily will include private individuals, may bring an action in an appropriate federal district court, and § 252(e)(4) provides that no state court shall have jurisdiction to review the action of a state commission in approving or rejecting an agreement under this section. We agree with the Seventh Circuit that “Congress has expressed unmistakably that, under [the Act], states could participate in the federal regulatory function delegated to them by

20

the federal government on the condition that their participation be reviewed in federal court" and that the "Act satisfies the requirement that Congress clearly state that participation by the state in the regulatory scheme entails a waiver of immunity from suit in federal court." Illinois Bell, 222 F.3d at 341; see also Pub. Serv. Comm'n, 216 F.3d at 938.

When the LPSC accepted Congress's offer under the 1996 Act to delegate federal authority to the state commission to act as an arbitrator in the present case, the regulation of interconnection agreements covered by the 1996 Act was no longer a permissible or lawful activity within the power of the states. As in Petty and Dole, Congress was under no obligation to offer states something they could not obtain on their own, viz., participation in the 1996 Act's federal regulation of local telecommunications competition. Also, as in those cases, the state was free to accept or reject such participation as a gratuity without abstaining from any lawful activity within its power. College Savings made clear that when Congress bestows a gift or gratuity, it may attach the condition of a waiver of Eleventh Amendment immunity to a state's acceptance. 527 U.S. at 686-87. Consequently, the LPSC voluntarily waived its state immunity when it accepted the Congressional offer of a gratuity and arbitrated the interconnection dispute in this case.


C.  Application of Ex parte Young

We agree with the Sixth, Seventh, and Tenth Circuits that a

21

suit such as this one, brought by AT&T Communications for injunctive relief against the individual members of the LPSC because a determination made by the commissioners is allegedly contrary to the 1996 Act, is a "straight forward" Ex parte Young case. Illinois Bell, 222 F.3d at 345; Pub. Serv. Comm'n, 216 F.3d at 939; Michigan Bell Tel. Co. v. Climax Tel. Co., 202 F.3d 862, 867 (6th Cir. 2000), cert. denied, 121 S.Ct. 54 (2000). Therefore, even if Plaintiffs' suit against the LPSC were barred by the Eleventh Amendment, the suit for prospective injunctive relief could proceed against the individual commissioners in their official capacities.

Under the Ex parte Young doctrine, a private party may sue individual state officers in federal court to obtain prospective relief from an ongoing violation of federal law. See Ex parte Young, 209 U.S. 123 (1908); Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 294 (1997) (O'Connor, J., concurring); id. at 298-99 (Souter, J. dissenting); Ysleta Del Sur Pueblo v. Laney, 199 F.3d 281, 289 (5th Cir. 2000), cert. denied, 120 S.Ct. 2007 (2000); Earles v. State Bd. of Certified Public Accountants of Louisiana, 139 F.3d 1033, 1039 (5th Cir. 1998). The purpose of the doctrine is to enable federal courts to "vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" Pennhurst, 465 U.S. at 105 (quoting Ex parte Young, 209 U.S. at 160). In the present case, AT&T Communications filed suit against the individual LPSC commissioners in their official, rather

22

than personal, capacities. AT&T Communications alleges that the arbitral determination of the interconnection agreement by the commissioners violates the 1996 Act, a federal law. As the interconnection agreement determination binds present and future relations between AT&T Communications and BellSouth, the alleged violation of federal law is on-going. Finally, an order preventing the commissioners from enforcing provisions of the agreement which fail to meet the requirements of the 1996 Act will be purely prospective.

The LPSC commissioners counter that the present case fits within the exception to Ex parte Young recognized by the Supreme Court in Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996). The Court in Seminole Tribe held that suits against individual state officers in their official capacities for on-going violations of federal law are not available when Congress has enacted a comprehensive remedial scheme intended to be the sole remedy for violations of federal law. Id. at 74. Because the remedial scheme prescribed by Congress under the 1996 Act is significantly different from the congressional plan considered by the Court in Seminole Tribe, and does not manifest an intent to exclude Ex parte Young suits, we disagree with the commissioners' contention that Seminole Tribe precludes application of the Ex parte Young exception in this case.

In Seminole Tribe, the Supreme Court noted that the Indian Gaming Regulatory Act ("IGRA") provided that the sole judicial

23

remedy available under the act upon failed negotiations between the State and the plaintiffs was a court order requiring mediation between the parties. Id. If such mediation failed, the result under IGRA's elaborate remedial scheme was preemption of any proposed agreement between the parties by regulations issued by the Secretary of the Interior. Id. at 74-75. The Court thus noted that the powers of the federal district court under IGRA were limited "significantly," id. at 76; in comparison, the Court recognized that "an action brought against a state official under Ex parte Young would expose that official to the full remedial powers of a federal court, including, presumably, contempt sanctions." Id. at 75. The Court stated that "the fact that Congress [under IGRA] chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under Ex parte Young strongly indicates that Congress had no wish to create the latter under [IGRA]." Seminole Tribe, 517 U.S. at 75-76.

The 1996 Act, however, does not severely limit relief available to an aggrieved party as does the IGRA. Section 252(e)(6) of the 1996 Act simply provides that, if the state commission makes a determination under that section, any aggrieved party may bring suit in federal court to determine whether the determination meets the Act's requirements. The 1996 Act does not limit jurisdiction of federal courts to entertain suits in law or equity for prospective relief from on-going violations of federal

24

law by state officials acting in their official capacities. It thus cannot be said that Congress intended in the 1996 Act to limit significantly the federal judicial remedies available to an aggrieved party authorized to bring suit in an appropriate federal court.[3] See Illinois Bell, 222 F.3d at 346 ("The power of the court under subsection 252(e)(6) stands in stark contrast with the court's powers to impose what the Supreme Court called a 'modest set of sanctions' under the statute at issue in Seminole Tribe.")(citing Seminole Tribe, 517 U.S. at 75).

Appellees also argue that the Supreme Court's decision in Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997), precludes applicability of Ex parte Young to the present case. However, this circuit has rejected the idea that Coeur d'Alene affects the traditional application of Ex parte Young:

> We concur with the consensus among other courts that although the principal opinion in Coeur d'Alene suggests a case-by-case (rather than rule-based) approach to the application of Ex parte Young, see Coeur d'Alene, 521 U.S. 261, 276-282 , 117 S.Ct. at 2038-2040 (opinion of Kennedy, J.), this part of the opinion did not muster a majority, and a majority of the Court would continue to apply the rule of Ex parte Young as it has been

---

[3]The LPSC and its commissioners contend that because review under section 252 (e)(6) is limited in subject matter to a determination of "whether the agreement or statement [as determined by the state commission] meets the requirements of section 251," the remedial scheme created by the 1996 Act is more limited than traditional Ex parte Young suits, and therefore such suits with respect to the Act are precluded under Seminole Tribe. However, this limitation defines the courts' subject matter jurisdiction in all suits brought to enforce the provisions of the 1996 Act rather than the relief available in such a suit. Therefore, the Act does not prohibit the application of the Ex parte Young doctrine.

25

traditionally understood, see _id_. at 296, 117 S.Ct. at 2047 (O'Connor, J., concurring in part and concurring in the judgment(joined by Scalia and Thomas, JJ.)); _id_. at 297, 117 S.Ct. at 2048 (Souter, J., dissenting (joined by Stevens, Ginsburg, and Breyer, JJ.)).

<u>Earles v. State Bd. of Certified Public Accountants of Louisiana</u>, 139 F.3d 1033, 1039 (5th Cir. 1998).

Accordingly, the application of <u>Ex parte Young</u> to suits against state commissioners under section 252(e)(6) of the 1996 Act remains unaffected by either <u>Seminole Tribe</u> or <u>Coeur d'Alene</u>. <u>See</u> <u>Illinois Bell</u>, 222 F.3d 323, 347 (7th Cir. 2000); <u>Pub. Serv. Comm'n</u>, 216 F.3d 929, 940 (10th Cir. 2000); and <u>Michigan Bell Tel. Co. v. Climax Tel. Co</u>., 202 F.3d 862, 867 (6th Cir. 1999).


## IV.  Conclusion

Because the LPSC voluntarily waived the state's Eleventh Amendment immunity in the present case, we REVERSE the decision of the district court dismissing AT&T Communication's suit against LPSC.  Because the <u>Ex parte Young</u> doctrine applies, we also REVERSE the decision of the district court dismissing AT&T Communication's suit against the individual commissioners.  The case is REMANDED for further proceedings consistent with this opinion.


ENDRECORD

JERRY E. SMITH, Circuit Judge, dissenting:

I respectfully dissent and would affirm the dismissal. The district court correctly opined that defendants are immune under the Eleventh Amendment.

When a state commission elects to arbitrate an interconnection agreement or approve a Statement of Generally Available Terms ("SGAT"), the Telecommunications Act of 1996 (the "1996 Act" or the "Act") vests jurisdiction in the federal courts for any aggrieved party to challenge state actions inconsistent with the requirements of the Act.[4] That jurisdiction is exclusive.[5] Pursuant to the Eleventh Amendment, however, federal courts may not entertain suits by citizens against states arising out of congressional legislation, such as the 1996 Act, enacted under the Commerce Clause.[6]

Under the Eleventh Amendment, states enjoy broad sovereign

---

[4] "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6).

[5] "If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." *Id.* § 252(e)(4).

[6] *See Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996).

immunity from suit in federal court:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. Though the amendment's text most reasonably applies only to suits in *diversity*, the Supreme Court has consistently looked to the principle underlying the amendment to bar suits on *federal* causes of action as well.[7] Thus, individuals may not sue states in federal court on causes of action arising out of Article I legislation such as the 1996 Act.[8]

This immunity extends not only to states but to their agencies, as well.[9] The Eleventh Amendment thus immunizes the Louisiana Commission from suit in federal court. Under certain, limited circumstances, however, state *officials*SSlike the commissionersSSmay be subjected to suit, notwithstanding the Eleventh Amendment, under *Ex parte Young*, 209 U.S. 123, 158-59 (1908).

---

[7] *See id.* at 69-70 (rejecting blind reliance on the text of the Eleventh Amendment because it dealt only with particular problem of diversity jurisdiction created by an incorrect decision in *Chisolm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793)); *Hans v. Louisiana*, 134 U.S. 1 (1890) (same).

[8] *See, e.g., Hans*, 134 U.S. at 18-19; *Seminole Tribe*, 517 U.S. at 72-73. Of course, federal legislation enacted pursuant to Section 5 of the Fourteenth Amendment may constitutionally abrogate state sovereign immunity. *See Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976).

[9] *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993).

Whether the 1996 Act violates the Eleventh Amendment is *res nova* in this Circuit.[10]  On appeal, the telephone carriers present three unconvincing theories to avoid sovereign immunity.

*First*, the carriers assert the application of the doctrine announced in *Young* to allow suit against the *commissioners*.  *Second*, they assert that the commission effectively *waived* its state sovereign immunity by electing to arbitrate the interconnection agreement and approve BellSouth's SGAT under powers granted by the 1996 Act.  *Third*, AT&T claims that the Act contemplates only appellate-style judicial review and thus does not fall within the Eleventh Amendment's prohibition of "suit[s] in law or equity."[11]

The Supreme Court recently addressed the *Young* and waiver issues in, respectively, *Seminole Tribe* and *College Savings Bank v. Florida Prepaid Postsecondary Educational Expense Board*, 527 U.S. 666 (1999), recognizing a broad Eleventh Amendment immunity sufficiently capacious to bar suit here under the 1996 Act.  In seeking reversal, the telephone carriers urge, and the majority adopts, an unduly narrow interpretation of those rulings.  They would look to the facts, circumstances, and rationales of each holding as somehow *exhaustive* of the proper scope of the Eleventh Amendment jurisdic-

---

[10] The majority relies substantially on *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999), but the Eleventh Amendment issue was neither presented nor addressed in that case.

[11] The majority summarily rejects this argument, and I agree.

tional bar, rather than merely *illustrative* of the immunity states enjoy from suit in federal court.

## I.

In *Seminole Tribe*, the Court breathed new life into Eleventh Amendment immunity. That holding not only expanded the scope of the amendment to cover all federal causes of action arising out Congress's Article I powers[12]SSthereby barring suit under the 1996 Act against a *State commission*SSbut also narrowed the fictional exception to state sovereign immunity first established in *Young*SSthereby barring suit under the Act against *state commissioners* as well.[13] The majority therefore errs in accepting the telephone carriers' argument that AT&T's suit should be permitted to

---

[12] *See Seminole Tribe*, 517 U.S. at 72-73 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."). *Seminole Tribe* specifically involved the Indian Commerce Clause and explicitly overruled *Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989), which had addressed the Interstate Commerce Clause, *see Seminole Tribe*, 517 U.S. at 66SSprovisions both found within Congress's legislative powers enumerated in Article I, Section 8. But a state's sovereign immunity is not restricted to that section, for *Hans* itself dealt with the Contracts Clause, a constitutional restriction on the states located within Article I, Section 10. *See Hans*.

[13] *See Seminole Tribe*, 517 U.S. at 74 (stating that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*.").

proceed against the member commissioners under *Young*.

In *Young*, the Court fashioned a *judicial* remedy to provide prospective relief against state *officials* to redress ongoing violations of federal law, as a special exception to the Eleventh Amendment bar to suit.  Under *Seminole Tribe,* however, *judicial* relief pursuant to *Young* is not available to redress violations of the 1996 Act, because the Act provides a limited *statutory* remedial scheme that *supplants* the relief otherwise alternatively available under *Young*.

A.

It is not enough that the Eleventh Amendment *permits* judicial application of *Young* to the 1996 Act.  Under *Seminole Tribe,* courts additionally must determine whether, in enacting that bill, Congress acted to *supplant* that judicial remedy by substituting a statute-based remedial scheme.  *See Seminole Tribe*, 517 U.S. at 74-76.

1.

As a judicially-crafted exception to the Eleventh Amendment, the *Young* doctrine is not a fiction in which courts ought to engage lightly.[14]  It was created in *Young* to give relief against state of

---

[14] *See Seminole Tribe*, 517 U.S. at 74-76 (noting that *Young* is a
(continued...)

ficials to vindicate *constitutional* rights.[15]  *Young* since has been extended to vindicate federal *statutory* rights.[16]

Nevertheless, it is Congress that creates federal statutory rights, so it is also Congress that dictates the remedies available to enforce statutory violations.[17]  Thus, "where Congress has pre-scribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate be-fore casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*."  *Seminole*

---

[14](...continued)
"narrow exception to the Eleventh Amendment").

[15] *See Young*, 209 U.S. at 159-60 ("The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity.  It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional.  If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.").

[16] *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 105-06 (1984) (recognizing that the *Young* remedy is available to address violations of federal but not state law).

[17] *See* David P. Currie, Ex Parte Young *After* Seminole Tribe, 72 N.Y.U. L. REV. 547, 549 (1997) ("Congress is perfectly free to abolish the remedy recognized by *Ex parte Young*."); *id.* at 551 ("*Seminole Tribe* will have its most significant effect on actions involving statutory, not constitutional rights.")

*Tribe*, 517 U.S. at 74.[18]

The question, then, is whether the judicial review provisions of the 1996 Act establish a "detailed remedial scheme for the enforcement . . . of a statutorily created right," *id.*, sufficient under *Seminole Tribe* to supplant the judicially-made *Young* remedy that otherwise would be alternatively available to AT&T. *See Seminole Tribe*, 517 U.S. at 74. In other words, we must determine whether AT&T may pursue relief exclusively through the Act or whether, alternatively, *Young* is also available.

In concluding that an Indian gaming act supplanted *Young*, the *Seminole Tribe* Court explained:

> Here, Congress intended [the rights conferred by the act] to be enforced against the State in an action brought under [25 U.S.C. § 2710(d)(7)]; the intricate procedures set forth in that provision show that Congress intended therein not only to define, but also to limit significantly, the duty imposed by § 2710(d)(3). For example, where the court finds that the State has failed to negotiate in good faith, the only remedy prescribed is an order directing the State and the Indian tribe to conclude a compact within 60 days. And if the parties disregard the court's order and fail to conclude a compact within the 60-day period, the only sanction is that each party then must submit a proposed compact to a mediator who selects the one which best embodies the terms of the Act. Finally, if the State fails to accept the compact selected by the mediator, the only sanction against it is that the mediator shall notify the Secretary of the Interior who then must prescribe regulations governing class III gaming on the tribal lands at issue. By contrast with this quite modest set of sanctions, an action brought against a state official under *Ex parte Young*

---

[18] *See also* Currie, 72 N.Y.U. L. REV. at 551 ("*Seminole Tribe* may well preclude the use of *Ex parte Young* in additional cases involving statutory rights.").

> would expose that official to the full remedial powers of a federal court, including, presumably, contempt sanctions. If § 2710(d)(3) could be enforced in a suit under *Ex parte Young*, § 2710(d)(7) would have been superfluous; it is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more complete and more immediate relief would be available under *Ex parte Young*.

*Id.* at 74-75 (footnote omitted).

In other words, to supplant *Young*, a statute must provide a *detailed* and *limited* remedial legislative scheme, narrower in scope than what would be available under *Young*. Otherwise, to invoke *Young* would be to render the judicial review provisions of a statute superfluous.

Under the 1996 Act, an aggrieved party may seek judicial review only under certain conditions: "In any case in which a State commission makes a *determination* under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the *agreement or statement* meets the requirements of section 251 . . . ." 47 U.S.C. § 252(e)(6) (emphasis added). The Act thus limits the timing of access to federal courts, the scope of commission conduct subject to judicial review, and the defendants vulnerable to suit.

*First,* with respect to access to suit and the scope of reviewable commission conduct, aggrieved parties have a right to judicial relief under the Act, but only *after* the State commission has made

a *determination*.[19]  This is not unlike the requirement of a final agency action to trigger Administrative Procedure Act judicial review, *see* 5 U.S.C. §§ 702, 704, and it is available only to review the validity of a commission agreement or statement under the Act and not its process.  The 1996 Act thus imposes a number of statutory duties on State commissions that are either not effectively or only partially effectively reviewable under this judicial review provision, including the duty to arbitrate open issues brought to the commission, *see* 47 U.S.C. § 252(a)(2); the duty to provide an opportunity to respond to the party against whom another party has petitioned for arbitration, *see id.* § 252(b)(3); the duty to arbitrate only those issues raised by a petition, *see id.* § 252(b)-(4)(A); the duty to conclude the resolution of unresolved issues within nine months of the initial request, *see id.* § 252(b)(4)(C); and, with respect to SGAT's, the duty to complete review within sixty days of submission, *see id.* § 252(f)(3).

To delay judicial review until the state commission actually *makes* a *determination* (rather than before), and then to limit that review only to ensuring that any *agreement* or *statement* (as opposed

---

[19] *See GTE Southwest, Inc. v. Graves*, 989 F. Supp. 1148, 1150 (W.D. Okla. 1997); *GTE N. Inc. v. Glazer*, 989 F. Supp. 922 (N.D. Ohio 1997); *GTE Northwest, Inc. v. Nelson,* 969 F. Supp. 654 (D. Wash. 1997); *GTE Fla., Inc. v. Johnson*, 964 F. Supp. 333 (N.D. Fla. 1997); *GTE S. Inc. v. Breathitt*, 963 F. Supp. 610 (E.D. Ky. 1997); *GTE S. Inc. v. Morrison*, 957 F. Supp. 800 (E.D. Va. 1997); *Contel, Inc. v. Jacobs*, 1997 WL 809628 (D. Minn. 1997).

to the arbitration process itself) complies with the Act, is to "limit significantly . . . the dut[ies] imposed by"[20] the Act and thus to supplant relief under *Young*. A plaintiff might prefer to seek the immediate injunctive relief offered by *Young* to redress ongoing violations of the Act,[21] but the Act requires the aggrieved party to wait for a determination by the state commission before filing suit, even if it means that some violations, such as compliance with the statutory deadlines, might never be redressed. The Act therefore provides a remedial scheme that supplants relief otherwise offered by *Young*.

*Second,* the Act refers only to cases involving "a State *commission.*" *Id.* § 252(e)(6). No reference is made to state *commissioners*. As *Seminole Tribe* teaches, courts should not lightly construe Congressional intent to "expose [a state] official to the full remedial powers of a federal court, including, presumably, contempt sanctions," where the statute seems to suggest otherwise by providing alternative remedies. *Seminole Tribe*, 517 U.S. at

---

[20] *Seminole Tribe*, 517 U.S. at 74.

[21] That an on-going violation is the result of a past wrong does not transform the remedy from a prospective to a retrospective one. Relief under *Young* is still available in these cases. *See CSX Transp., Inc. v. Bd. of Pub. Works*, 138 F.3d 537, 541 (4th Cir. 1998) (stating that "a future injunction is not made retrospective merely because it recognizes that an ongoing violation of law is the result of a past wrong.").

75.[22] Given that only parties "aggrieved by such determination may bring an action" and that such actions are limited "to determin-[ing] whether the agreement or statement" complies with the Act, § 252(e)(6), the most reasonable construction is to limit the scope of judicial review to the only parties able to trigger itSSstate commissions.[23]

Notwithstanding the availability of injunctive relief, the judicial review provisions are sufficiently limited to supplant relief under *Young*. That the limited statutory remedy under the Act

---

[22] *See id.* at 75 n.17 (distinguishing between statutes expressly permitting suit against specific state officials and those allowing suit only against "the State").

[23] The state defendants additionally argue that the Act's judicial review provision does not provide for injunctive relief, thereby further enlarging the gap between relief under the Act and that provided by *Young*. The Act simply authorizes federal courts to review only to ensure that any "agreement or statement meets the requirements of" the 1996 Act. *Id.* Although the only case in this circuit to have construed the Act's judicial review provision, *Southwestern Bell Telephone Co. v. Public Utility Commission*, 208 F.3d 475 (5th Cir. 2000), did not involve the Eleventh Amendment, we did indicate an inclination to adopt a "broader view" of the provision. *See id.* at 481-82 (construing the Act to permit review of state commissions for compliance with state law, under the arbitrary-and-capricious standard, in addition to *de novo* review of compliance with Act). A natural reading of the text is that it defines merely the scope of *state conduct subject to judicial review*, rather than the *available remedies*, and that our authority to enforce compliance reasonably includes the availability of injunctive reliefSSalbeit only against the state commission and not its commissioners. *See Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 66 (1992) (stating that "although we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise") (citation omitted).

against *state commissions* is actually *not* available because it is unconstitutional under the Eleventh Amendment does not alter the determination that the Act supplants *Young* relief against *state commissioners*. The Supreme Court directly confronted this issue in *Seminole Tribe*, concluding that the Court could consider the alternative remedy provided by Congress sufficient to supplant relief under *Young*, notwithstanding the fact that that remedy was unconstitutional. This result struck some commentators as absurd,[24] but the Court unhesitatingly concluded that it is for Congress, and not the courts, to rewrite defective statutes.[25]

---

[24] *See* Currie, 72 N.Y.U. L. REV. at 550 ("That said, the application of [this] principle in *Seminole Tribe* makes no sense. The majority held *Ex parte Young* precluded by a provision it had just declared unconstitutionalSSthe section authorizing suit against the state itself. One of the essential characteristics of unconstitutional provisions is that they have no effect. Moreover, the inability to make the state suable removes the only plausible basis for believing that Congress would have wanted to forbid suit against the Governor under *Ex parte Young* . . . . [T]he last thing that Congress would have wanted was to leave the offended party with no remedy at all.").

[25] *See Seminole Tribe*, 517 U.S. at 75-76 ("Here, of course, we have found that Congress does not have authority under the Constitution to make the State suable in federal court under § 2710(d)(7). Nevertheless, the fact that Congress chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young* strongly indicates that Congress had no wish to create the latter under § 2710(d)(3). Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known that § 2710(d)(7) was beyond its authority. If that effort is to be made, it should be made by Congress, and not by the federal courts. We hold that *Ex parte Young* is inapplicable to petitioner's suit against the Governor of Florida, and therefore that suit is barred by the Eleventh
(continued...)

2.

The telephone carriers and the majority would apply a narrower reading of *Seminole Tribe*, however, limiting its scope to the particular federal statute that decision construed. The carriers argue that the 1996 Act does *not* limit relief nearly as dramatically as does the statute in *Seminole Tribe* and that *Seminole Tribe* held only that that enactment was sufficient to supplant *Young*. After all, the same kind of *injunctive relief* to redress ongoing violations is available under the 1996 Act as is available under *Young*; that was not so in *Seminole Tribe*. All an aggrieved party need do under the 1996 Act is to satisfy the administrative exhaustion-like conditions of the Act's judicial review provision, as was done here.

But that is *precisely* the problem under *Seminole Tribe*. Section 252(e)(6) limits the scope of Commission conduct subject to scrutiny by federal courts and thus supplants *Young*. Under *Seminole Tribe*, 517 U.S. at 74, *Young* relief is unavailable when, by enacting the statute, "Congress intended therein not only to define, but also to limit significantly, the duty imposed" by the statute through a limited remedial scheme.

This is the carriers' strongest argument against applying *Seminole Tribe*, which is silent on the question, because *Seminole*

---

[25](...continued)
Amendment and must be dismissed for a lack of jurisdiction.").

*Tribe* does not expressly state that a federal statute limiting defendants and commission duties subject to judicial review, but not remedies such as injunctive relief, is sufficient to supplant *Young*. Nonetheless, the carriers' attempt to distinguish between limits on available remedies (as in *Seminole Tribe*) and limits on defendants and duties (as in the instant case) finds no support in *Seminole Tribe*, which, after all, describes *Young* relief as a "narrow exception to the Eleventh Amendment." *Id.* at 74. Therefore, in the face of ambiguity in *Seminole Tribe* as to whether it precludes *Young* relief only where a statute prohibits certain judicial *remedies*, or also where a statute limits only *defendants* and *duties*, the majority errs in resolving that ambiguity against state sovereign immunity.

## B.

Because the Act confers exclusive jurisdiction in the federal courts,[26] and, as I have shown, an action in federal court is barred under the Eleventh Amendment, no review to enforce the commission's or a commissioner's compliance with the Act is available in state

---

[26] "If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." 47 U.S.C. § 252(e)(4).

or federal court.  This circumstanceSSthat there is neither a state nor a federal forum to vindicate federal rights created by the ActSSis not alone sufficient to trigger relief under *Young*.  Such a rule was suggested in *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997), as a mere factor to support application of *Young*, but even that minimal suggestion was endorsed by only two Justices[27] and expressly repudiated by three.[28]  The governing rule remains the same:  Relief under *Young* is available where prospective relief is necessary to redress on-going violations of federal law,[29] but only if Congress has not supplanted that relief with an alternative, limited remedial scheme.  *See Seminole Tribe*, 517 U.S. at 74-75.

## II.

It is not enough to say that the Eleventh Amendment applies and that the narrow exception of *Young* has been supplanted by Congress, for a state might be found to have *waived* such immunity.  There is no actual waiver in this case, and, even if constructive

---

[27] *See Coeur d'Alene Tribe,* 521 U.S. at 270-74 (Kennedy, J., joined by Rehnquist, C.J.).

[28] *See id.* at 291-92 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring).

[29] *See id.* at 294 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring) (opining that "a *Young* suit is available where a plaintiff alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective"); *id.* at 298-99 (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ., dissenting) (same).

waiver is still available as a matter of law, the state defendants did not waive its immunity voluntarily.  They therefore have retained their immunity under the Eleventh Amendment.

## A.

As the majority seems to acknowledge, there was no express waiver; Louisiana did not enact a law or otherwise express its consent to suit in federal court under the 1996 Act.  Instead, the majority reasons that Louisiana effected "a voluntary gratuity induced waiver" by participating in the regulatory scheme.

In *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999), the Court overruled *Parden v. Terminal Railway of Alabama Docks Department*, 377 U.S. 184 (1964), and rejected the theory that a state might constructively waive sovereign immunity.[30]  In its place, the Court adopted "[t]he classic description of an effective waiver of a constitutional right"SSthat is, "the intentional relinquishment or abandonment of a known right or privilege."  *College Sav. Bank*, 527 U.S. at 682.  The test is a "stringent one."  *Id*. at 675.  In any event, the majority correctly acknowledges that a theory of constructive waiver is no longer viable.

---

[30] *See College Sav. Bank*, 527 U.S. at 680 ("We think that the constructive-waiver experiment of *Parden* was ill conceived, and see no merit in attempting to salvage any remnant of it. . . . Whatever may remain of our decision in *Parden* is expressly overruled.").

B.

For a waiver to be effective, it must be completely voluntary and not coerced or based on an unconstitutional condition. The majority errs in concluding that the supposed waiver here meets that requirement.

"[W]here the constitutionally guaranteed protection of the States' sovereign immunity is involved, the point of coercion is automatically passedSSand the voluntariness of waiver destroyedSSwhen what is attached to the refusal to waive is the *exclusion of the State from otherwise lawful activity*." *College Sav. Bank*, 527 U.S. at 687 (emphasis added). The protection of *College Savings Bank* is not limited only to states that were *previously engaging in federally-regulated activity* (as distinguished from states that were merely participating in a federal program), as mistakenly urged by the carriers, but instead extends to *any otherwise lawful activity*. For example, the Court rejected, out of hand, any exception whatsoever for states acting as market participants. *Id.* at 685–86.[31]

---

[31] In *College Savings Bank*, however, the Court distinguished waivers induced under the Compact and Spending Clauses on the ground that Congressional approval of interstate compacts and disbursement of federal funds to the states are matters of *Congressional gratuity* and do not improperly *interfere* with a state's ability to conduct *otherwise lawful activity*. *Id.* at 686 (citing *Petty v. Tenn.–Mo. Bridge Comm'n*, 359 U.S. 275 (1959) (Compact Clause), and *South Dakota v. Dole*, 483 U.S. 203 (1987) (continued...)

The 1996 Act does not force states to waive their sovereign immunity, but it unconstitutionally subjects to suit in federal court any state commission that elects to arbitrate interconnection agreements between competitors operating in local telephone service markets within their jurisdiction or to approve SGAT's of Bell Operating Companies providing service to their jurisdiction.  The telephone carriers emphasize that the Act gives clear notice that state commissions choosing to regulate will subject themselves to suit in federal court.[32]  After *College Savings Bank*, however, clear notice, though still necessary, is no longer sufficient to induce waiver of Eleventh Amendment immunity.

Under *College Savings Bank*, even a clearly-induced waiver is ineffective if arbitration of interconnection agreements or approval of SGAT's by a state commission constitutes "otherwise lawful activity." *Id.* at 687.  The question, therefore, is whether arbitration of interconnection agreements or approval of SGAT's by a state commission constitutes "otherwise lawful activity" for which Congress cannot condition a waiver of sovereign immunity, or wheth-

---

[31](...continued)
(Spending Clause)).

[32] *See Dole*, 483 U.S. at 207 (holding that "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation") (citations omitted); *Atascadero*, 473 U.S. at 247 (holding that the Rehabilitation Act "falls far short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity").

er, instead, the grant of such power to the states is a gift or gratuity, which Congress may so condition.  *Id*. at 686-87.

Before the 1996 Act, state commissions regulated local telephone service markets within their jurisdiction.  The Act takes that *local* regulatory power from the states,[33] as the telephone carriers themselves appear to concede.  Granted, the Act does not keep such authority exclusively in the hands of Congress or the FCC, but allows it *back* to the state commissions.  That delegation back to the states is permitted under the statute, however, *only* if the states subject themselves to suit in federal court.

Congress was *not* merely conditioning a gift or a gratuity, as the carriers insist and the majority concludes.  Rather, the Act imposes conditions on states wishing to continue to regulate local telephone markets as they once did.  This Congress cannot do.

In essence, the Act requires state commissions to sacrifice either policy preference or sovereign immunity.  A state commission may wish to intervene and make its policy preferences known, but doing so subjects it to federal jurisdiction.  To avoid federal jurisdiction, a state commission must abdicate its regulatory goals and hope that the private parties and the FCC will come to a solution it would endorse.  This hardly rises to a voluntary waiver of

---

[33] *See AT&T Corp.*, 525 U.S. at 379 n.6 ("But the question in these cases is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States.  With regard to the matters addressed by the 1996 Act, it unquestionably has.").

a state's constitutional right to sovereign immunity in federal court.

The telephone carriers would re-characterize state commission powers under the Act as "*federal* regulatory authority," and thus the kind of activity in which a state may *not* lawfully engage without congressional authorization.  They and the panel majority would analogize the Act to congressional exercises of its powers under the Compact and Spending Clauses, under which Congress is constitutionally authorized under *College Savings Bank* to require waiver.

The regulatory powers enjoyed by state commissions under the 1996 Act are indeed "federal" in the sense that Congress, and not a particular state, has articulated the governing standards.  But the underlying subject matter nevertheless remains within the in-disputable (if non-exclusive) domain of the states.  Like other matters of commerce, local telephony is a matter *both* within the jurisdiction of state regulators *and* subject to federal preemption. As the majority observes, "[T]he question in this case is not whether the Federal Government has taken the regulation of local telecommunications competition away from the states.  With regard to the matters addressed by the 1996 Act, it unquestionably has." *Iowa Utils. Bd.*, 525 U.S. at 379 n.6.

To be sure, Congress could have preempted state regulation of

all telephony.[34]  And Congress may give the states the option of providing their own regulations or facing preemption by federal law.[35]  But the greater does not always include the lesser, and it certainly does not when state *sovereignty*SSas opposed to mere *policy preference*SSis at issue.

In pursuit of legitimate ends such as telephony regulation, Congress may not offend state sovereignty.  This was so in the commandeering cases[36] and is no less so here with respect to the Eleventh Amendment.  Congress may ask states to choose either to regulate or to stand back and let federal law take over.  But just as it cannot *commandeer* states to conduct federal regulation on behalf of the United States, it cannot condition, on *submission to suits in federal court*, state participation in those regulatory af-

---

[34] *See FERC v. Mississippi*, 456 U.S. 742, 764 (1982) (noting that "the commerce power permits Congress to pre-empt the States entirely in the regulation of private utilities"); *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290 (1981) ("A wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating private activity affecting interstate commerce").

[35] *See FERC*, 456 U.S. at 765 (stating that, because "Congress could have pre-empted the field," statutes "should not be invalid simply because, out of deference to state authority, Congress adopted a less intrusive scheme and allowed the States to continue regulating in the area on the condition that they *consider* the suggested federal standards"); *New York v. United States*, 505 U.S. 144, 167 (1992) (observing that "[w]e have recognized Congress' power to offer States the choice of regulating [commercial] activity according to federal standards or having state law preempted by federal regulation").

[36] *See Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*.

fairs in which states once freely engaged.

Thus, the telephone carriers' argument that state commissions enjoy the option whether to regulate may solve *Tenth* Amendment problems raised in *Printz* or *New York* but does not address the concern of coerced waiver of state sovereignty under the *Eleventh* Amendment. Giving states the choice whether to be preempted by federal law represents a permissible form of "cooperative federalism," *Hodel*, 452 U.S. at 289, but the conscription of state officials to execute federal regulatory programs or the subjection of state officers to suit in federal court diminishes the "accountability of state [and] federal officials" and thereby violates constitutional principles of federalism, *Printz*, 521 U.S. at 929-30.

III.

The Eleventh Amendment bars AT&T from suing the state defendants but not from suing BellSouth. AT&T thus argues that the district court abused its discretion when it dismissed the entire case, even as to BellSouth.[37]

Authority to dismiss an *entire* case because of the unavailability of *one particular party* is governed by FED. R. CIV. P. 19, which "*requires* that if, *as a matter of equity* the court finds that the lawsuit cannot proceed without the absent party, then that par-

---

[37] The majority's erroneous disposition of the other issues on appeal rendered unnecessary a discussion by the majority of this indispensable-party issue.

ty be considered *indispensable* and the case dismissed." *Shelton*, 843 F.2d at 216 (emphasis added)  We review the district court's exercise of its equitable powers for abuse of discretion. *See In re Nikoloutsos*, 199 F.3d at 236.

To determine whether a party is indispensable, courts look to rule 19(b), which states:

> [T]he court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.  The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

The determination of whether a party is "indispensable" is thus a pragmatic one.[38]  "The distilled essence" of the four factors "is the attempt to balance the rights of all concerned." *Schutten*, 421 F.2d at 873.  In other words,

> [t]he plaintiff has the right to "control" his own litigation and to choose his own forum. This "right" is, however, like all other rights, "defined" by the rights of others.  Thus the defendant has the right to be safe from

---

[38] *See Fernandes v. Limmer*, 663 F.2d 619, 636 (Former 5th Cir. Dec. 1981) ("Courts confronted with motions to dismiss a suit for failure to join purportedly 'indispensable parties' properly approach the problem pragmatically."); *Schutten v. Shell Oil Co.*, 421 F.2d 869, 873 (5th Cir. 1970) ("The 1966 amendment of Rule 19 attempts to remedy this situation by conditioning a finding of 'indispensability' upon 'pragmatic considerations.'") (citation omitted).

> needless multiple litigation and from incurring avoidable inconsistent obligations.  Likewise the interests of the outsider who cannot be joined must be considered.  Finally there is the public interest and the interest the court has in seeing that insofar as possible the litigation will be both effective and expeditious.

*Id.*

The district court did not abuse its equitable powers, under rule 19, to dismiss the entire case.  It fairly reasoned that it "lacks the power [under *Seminole Tribe*] to create a remedy under the 1996 Act.  The congressional choice of remedy must be respected.  Therefore, the plaintiffs can no longer obtain the relief that they requested in their complaints against the Public Service Commission."  *AT&T Communications*, 43 F. Supp. 2d at 604.

Imagine if it were otherwise:  The 1996 Act cannot constitutionally subject state commissions to suit.  For a federal court then to rule on the validity of an agreementSSonly as against the other carrier, and not against the state defendants as wellSSis potentially to expose the carriers to conflicting orders.  AT&T's suggestion that the Act allows the FCC to take over regulatory authority from the state commission "[i]f a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section," § 252(e)(5), is of little help, for the very problem at hand is not the commission's *failure to act*, but the *validity of those acts under federal law*, and the Act permits FCC jurisdiction only in cases of the former.

Thus, in rejecting the argument that, under § 252(e)(6), the

other party to the agreement (here, BellSouth) was the "only proper part[y] for suit," one court opined:

> It is the [Commission's] duty, if it chooses to regulate, not the other party's, to ensure that the agreement meets the requirements of the Act . . . . Furthermore, it is the [Commission's] function, not the other party's, to enforce the agreement. Lacking power to enjoin the [Commission] from enforcing the approved agreement, federal courts would have *little effective remedy for aggrieved plaintiffs*, or would subject companies to the *intolerable prospect of conflicting commands* from federal courts and state regulatory agencies.

*Michigan Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 868 (6th Cir.) (emphasis added), *cert. denied*, 121 S. Ct. 54 (2000).

To allow suit here against BellSouth potentially either would expose the carriers to conflicting commands or would prejudice the state defendants by putting their policy preferences at risk of reversal notwithstanding their immunity under the Eleventh Amendment from interference by federal courts. Thus, AT&T's argument that rule 19(b) ought not bar suit against BellSouth because no adequate remedy is otherwise available directly confronts another rule 19(b) factorSSthat is, that any adequate remedy inevitably and simultaneously would prejudice the Louisiana Commission's immunity from interference of the federal courts.

Finally, AT&T complains that "an equitable doctrine cannot be invoked to defeat the statutory mandate that aggrieved parties have the right of review of the legality of commission-approved interconnection agreement [sic] in federal court." As I have explained, however, the statute is unconstitutional, and it is up to Congress

to fix it.

I respectfully dissent.