**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 20 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MCI TELECOMMUNICATIONS
CORPORATION, a Delaware corporation,

     Plaintiff - Appellee,

US WEST COMMUNICATIONS, INC., a
Colorado corporation,

     Plaintiff-Counter-Defendant -
     Appellee,

     v.

PUBLIC SERVICE COMMISSION OF
UTAH; STEPHEN F. MECHAM;
CONSTANCE B. WHITE; CLARK D.
JONES, Commissioners of the Public Service
Commission of Utah,

     Defendants - Appellants,

    and

AT&T COMMUNICATIONS OF THE
MOUNTAIN STATES, INC., a New York
corporation,

     Defendant,

UNITED STATES OF AMERICA,

     Defendant-Intervenor - Appellee.

No. 99-4203

---

Sandy J. Mooy, Utah Public Service Commission (Annina Mitchell, Assistant Attorney General, with her on the briefs), Salt Lake City, Utah, appearing for Defendants-Appellants.

Mark B. Stern, Attorney (William B. Schultz, Acting Assistant Attorney General, David J. Schwendiman, United States Attorney, Susan L. Pacholski, Attorney, Christopher J. Wright, General Counsel, John E. Ingle, Deputy Associate General Counsel, and Susan L. Launer, Deputy Associate General Counsel, with him on the brief), Appellate Staff Civil Division, Department of Justice, Washington, DC, appearing for the Defendant-Intervenor-Appellee.

Paul M. Smith, Jenner & Block, Washington, DC (Thomas F. O'Neil, III and William Single, IV, MCI Worldcom, Inc., Washington, DC, J. Alex Ward, Jenner & Block, Washington, DC, counsel for MCI Telecommunications Corp. and MCImetro Access Transmission Services, Inc.; Phillip L. Douglass, US West Law Department, Denver, Colorado, and Kara Sacilotto, Perkins, Coie LLP, Washington, DC, counsel for US West Communications, Inc.; Daniel Waggoner, Davis, Wright, Tremaine, LLP, Seattle, Washington, Thomas Pelto and Rebecca DeCook, AT&T Communications, Denver, Colorado, counsel for AT&T Communications of the Mountain States, Inc., with him on the brief), appearing for Appellees.

Before **TACHA**, **BALDOCK**, and **BRORBY**, Circuit Judges.

**TACHA**, Circuit Judge.

Defendants-appellants the Utah Public Service Commission (UPSC) and the individual commissioners appeal the district court's denial of their motion to dismiss on Eleventh Amendment immunity grounds. Defendants also contest the

district court's conclusion that it has jurisdiction to consider US West's takings claim. We exercise jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1291 and the collateral order doctrine, see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147 (1993), and affirm. We do not reach the merits of defendants' argument on the takings claim.

## I. Telecommunications Act of 1996

### A. History

This case arises under the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.A. (West Supp. 2000)) ("1996 Act" or "Act"). The 1996 Act amended the Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended in scattered sections of 47 U.S.C.A. (West 1991 & Supp. 2000)) ("1934 Act"). Congress adopted the 1934 Act "to protect American consumers against AT&T which, through an aggressive policy of consolidation, had gained a virtual monopoly over all segments of the telecommunications industry. Telephone service as a whole was viewed as a natural monopoly which needed to be regulated for the benefit of all users." Michael Kerf & Damien Geradin, Controlling Market Power in Telecommunications: Antitrust vs. Sector-Specific Regulation: An Assessment of the United States, New Zealand and Australian Experiences, 14 Berkeley Tech. L.J. 919, 936 (1999). Thus, pursuant to the 1934 Act, Congress created the

Federal Communications Commission (FCC), and gave that agency jurisdiction to regulate interstate telephone services.  See Communications Act of 1934, ch. 652, § 1, 48 Stat. 1064 (codified as amended at 47 U.S.C.A. § 151) (creating the FCC and giving it authority over "interstate and foreign commerce in communication by wire and radio").

The 1934 Act left regulation of intrastate telephone services to the states. See id. § 2(b) (codified as amended at 47 U.S.C.A. § 152) (denying the FCC jurisdiction "with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier").  In regulating local phone service,

> [s]tates typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network.

AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999).  Most of the LECs were part of AT&T's Bell System and were known as Bell Operating Companies ("BOCs").  Kerf & Geradin, 14 Berkeley Tech. L.J. at 937.

"As the telephone industry developed in the 1950s and 1960s, many began to challenge the basic premise that telephone service was a natural monopoly." Id.  Eventually, potential competitors and the Department of Justice sued AT&T

to dismantle its virtual monopoly. Pursuant to a 1982 consent decree, AT&T agreed to divest the local BOCs and reorganize them into subsidiaries of seven independent local exchange carriers, known as regional BOCs. See United States v. Western Elec. Co., 569 F. Supp. 1057, 1061-62 & 1062 n.5 (D.D.C. 1983), aff'd sub nom. California v. United States, 464 U.S. 1013 (1983). In exchange, AT&T was permitted, among other things, to compete with virtually no restrictions in long-distance services. Kerf & Geradin, 14 Berkeley Tech. L.J. at 938.

While the 1982 consent decree fostered competition in the long-distance market, technological advances occurred that made "competition among multiple providers of local service seem possible." AT&T Corp., 952 U.S. at 371. Thus, by 1994, "[m]any states had already commenced their own efforts to deregulate the telecommunications industry" by permitting local competition. Deonne L. Bruning, The Telecommunications Act of 1996: The Challenge of Competition, 30 Creighton L. Rev. 1255, 1258 (1997). In 1996, Congress passed the Telecommunications Act to further encourage local competition. See Jim Chen, The Magnificent Seven: American Telephony's Deregulatory Shootout, 50 Hastings L.J. 1503, 1514 (1999) ("The Act sought to unleash three of the most deeply entrenched monopolists in the American economy–local exchange carriers, interexchange carriers, and cable system operators–on each other's markets in the

hope that competition among the large would dissolve these industrial giants.")
In so doing, Congress "fundamentally restructure[d] local telephone markets" and
"ended the longstanding regime of state-sanctioned monopolies." AT&T Corp.,
952 U.S. at 371.

**B. 47 U.S.C.A. §§ 251-252**

**1. Section 251**

To accomplish the goals of the Act, Congress "establish[ed] baseline rules
for every company that want[s] to provide telecommunications service." Bruning,
30 Creighton L. Rev. at 1258. Specifically, 47 U.S.C.A. § 251 imposes various
duties on incumbent LECs to facilitate market entry. Because incumbents own
the current network, "[f]oremost among these duties is the [incumbent] LEC's
obligation . . . to share its network with competitors." AT&T Corp., 952 U.S. at
371; see 47 U.S.C.A. § 251(c). Congress deemed network sharing, or
interconnection, necessary "so that all customers, even those served by a
competitor, can seamlessly and transparently make and receive calls." Bruning,
30 Creighton L. Rev. at 1259. Section 251 thus requires incumbents to negotiate
interconnection agreements with entrants in good faith. See 47 U.S.C.A. §
251(c)(1).

**2. Section 252**

Under § 252, an incumbent and a new carrier may privately agree on the

terms of an interconnection agreement. See id. § 252(a)(1). If private negotiation

fails, then either party can petition the state commission that regulates local phone

service to arbitrate any open issues. Id. § 252(b)(1). Whether an agreement is

adopted by negotiation or arbitration, it must be submitted to the state

commission. Id. § 252(e)(1). The state commission then must approve or reject

the agreement. Id.

A state commission may reject a negotiated agreement only if it

discriminates against non-party carriers or is inconsistent with the public interest,

convenience, and necessity. Id. § 252(e)(2)(A). On the other hand, a state

commission may reject an arbitrated agreement only if the agreement does not

comply with § 251, including the regulations prescribed by the FCC pursuant to §

251, or the pricing standards set forth in § 252(d). Id. § 252(e)(2)(B).

If a state commission does not approve or reject an agreement within

specified time periods, then the agreement is deemed approved. Id. § 252(e)(4).

However, if a state commission "fails to act to carry out its responsibility under [§

252]," then the FCC will preempt the state commission's jurisdiction over that

proceeding and assume the state commission's responsibility. Id. § 252(e)(5).[1] If

_____

[1]A state commission "fails to act" if it "fails to respond, within a
reasonable time, to a request for mediation . . . or . . . a request for arbitration . . .
or fails to complete an arbitration within the time limits established in section
252(b)(4)(C)." 47 C.F.R. § 51.801(b) (1999). A state commission does not fail to
act "if an agreement is deemed approved under section 252(e)(4)." Id. §

a state commission does act, any party "aggrieved" by its determination "may bring an action in an appropriate Federal district court to determine whether the agreement . . . meets the requirements of section 251 [and section 252]." Id. § 252(e)(6). State courts do not "have jurisdiction to review the action of a State commission in approving or rejecting an agreement." Id. § 252(e)(4). If a state commission fails to act and the FCC asserts jurisdiction, then "the proceeding by the [FCC] . . . and any judicial review of the [FCC's] actions shall be the exclusive remedies." Id. § 252(e)(6).

Thus, § 252 allows a state to choose whether it will participate in the federal regulatory scheme. If a state elects to regulate interconnection agreements through its state commission, then the state is subject to suit in federal court.

## II. Facts

On July 26, 1996, AT&T Communications of the Mountain States, Inc. ("AT&T"), filed a petition with the UPSC for arbitration with US West Telecommunications, Inc. ("US West") pursuant to § 252(b) of the Act. On September 3, 1996, MCI Metro Access Transmission Services, Inc. and MCI Telecommunications Corp. (collectively MCI) filed a similar petition for arbitration with US West. After consolidating the AT&T and MCI petitions, the

---

51.801(c). Thus, if a state commission does not approve or reject an agreement and it is deemed approved, the FCC cannot preempt the state commission's jurisdiction and review the agreement.

UPSC issued an arbitration order resolving a number of open issues. The order directed the parties to file fully executed interconnection agreements with the UPSC that were consistent with the UPSC's resolution of the parties' disputes. The UPSC then reviewed and approved the submitted interconnection agreements pursuant to 47 U.S.C.A. § 252(e).

US West subsequently filed suit against AT&T, MCI, the individual commissioners, and the UPSC in federal district court. US West challenged some provisions in its interconnection agreements with MCI and AT&T, raised a takings claim and sought declaratory and injunctive relief. On the same day, MCI filed suit against US West, the individual commissioners and the UPSC. After the district court consolidated the suits, the individual commissioners and the UPSC moved to have themselves dismissed from US West's suit pursuant to Fed. R. Civ. P. 12(b).[2] Defendants claimed that they were immune from suit under the Eleventh Amendment and that the district court did not have jurisdiction over US West's takings claim. The district court denied the motion, concluding that it had jurisdiction over defendants and the takings claim.

### III. Eleventh Amendment Immunity

"We review de novo a district court's denial of a state's claim of Eleventh

---

[2]Based on a stipulation reached with MCI, defendants did not move to have themselves dismissed from MCI's suit.

Amendment immunity from suit in federal court." Innes v. Kansas State Univ., 184 F.3d 1275, 1277 (10th Cir. 1999), cert. denied, __ U.S. __, 120 S. Ct. 1530 (2000).

The Eleventh Amendment to the U.S. Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Supreme Court has construed the Eleventh Amendment to mean that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).

However, state sovereign immunity is not absolute. First, a state may not assert an Eleventh Amendment defense where Congress has properly abrogated its immunity. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996). Second, a state may waive its sovereign immunity by consenting to suit in federal court. College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 119 S. Ct. 2219, 2223 (1999). Third, a private party may sue a state officer for prospective injunctive or declaratory relief from an ongoing violation of the Constitution or federal laws. See Ex parte Young, 209 U.S. 123, 159-60 (1908); see also Alden v. Maine, 527 U.S. 706, 119 S. Ct. 2240, 2267 (1999) (affirming the continuing vitality of Ex parte Young).

-10-

## IV. Analysis

Defendants contend that none of the limits on sovereign immunity apply to them, and that therefore they are immune from suit. The district court found that the UPSC waived its sovereign immunity when it opted to participate in the statutory scheme set forth in the Act. The district court also found that the individual commissioners were subject to suit under Ex parte Young. We agree with both findings.[3]

### A. Waiver

### 1. Means of Waiver

Generally, a state may waive its Eleventh Amendment immunity in one of two ways. First, a state waives its immunity if it voluntarily invokes the jurisdiction of a federal court. See College Sav. Bank, 119 S. Ct. at 2226. Second, a state waives its immunity if it "makes a clear declaration that it intends to submit itself to [a federal court's] jurisdiction." Id. (internal quotation marks

---

[3]The district court's opinion mentions abrogation in passing, and on appeal defendants' briefly argue that Congress could not have constitutionally abrogated state sovereign immunity through passage of the Act. Congress may abrogate the states' sovereign immunity in the exercise of its Section 5 power to enforce the Fourteenth Amendment. College Sav. Bank, 119 S. Ct. at 2224. After Seminole Tribe, however, "Congress may not abrogate state sovereign immunity pursuant to its Article I powers." Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 119 S. Ct. 2199, 2205 (1999). There is no question that Congress adopted both the 1934 Act and the 1996 Act pursuant to its Article I commerce power. Thus, we agree with defendants that Congress could not and did not abrogate the states' sovereign immunity under the 1996 Act.

and citation omitted).

A state can make a "clear declaration" of its consent to be sued in federal court by expressly waiving its immunity through a state statute or constitutional provision. See Innes, 184 F.3d at 1278. A state can also declare its intent to submit to suit by impliedly or constructively waiving its immunity if the declaration is clear and altogether voluntary. See generally College Sav. Bank, 119 S. Ct. 2219 (overruling the constructive waiver doctrine of Parden v. Terminal Ry. of Ala., 377 U.S. 184 (1964), but recognizing that a state may still constructively or impliedly waive its immunity in certain circumstances); see also Innes, 184 F.3d at 1280 (stating that nothing in College Savings Bank forecloses us from examining the underlying facts of a case to determine whether a state has unequivocally expressed its intent to waive its immunity).

Here, US West sued the UPSC and the individual commissioners. Accordingly, Utah did not invoke the jurisdiction of a federal court and thereby waive its immunity. Furthermore, Utah did not expressly consent to suit through a state statute or constitutional provision governing this case. See Utah Code Ann. § 63-30-16(1) (Supp. 1999) (providing that Utah state district courts have exclusive original jurisdiction over suits brought against the state); Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1233 (10th Cir. 1999) ("Utah has not waived its Eleventh Amendment immunity by statute."). Thus, the question is

whether, under College Savings Bank, Utah constructively waived its immunity from suit when it arbitrated an interconnection dispute between US West, AT&T and MCI pursuant to § 252 of the Act.

## 2. College Savings Bank

Because College Savings Bank overruled Parden's constructive waiver doctrine, we begin with a brief discussion of Parden. In Parden, the employees of a railroad owned and operated by the State of Alabama sued the railroad under the Federal Employer's Liability Act (FELA). 377 U.S. at 184-85. Alabama asserted a sovereign immunity defense. Id. The Supreme Court held that Alabama had waived its immunity because FELA conditioned a state's right to operate a railroad in interstate commerce upon amenability to suit in federal court. Id. at 192. Since Alabama chose to operate a railroad in interstate commerce, it impliedly accepted the conditions imposed by the act, including the condition that it consent to suit. Id.

In College Savings Bank, a New Jersey bank sued the Florida Prepaid Postsecondary Education Expense Board ("Florida Prepaid"), an arm of the State of Florida. 119 S. Ct. at 2223. Florida Prepaid administers a program designed to ensure that individuals have sufficient funds to finance a college education. Id. The bank claimed that Florida Prepaid misrepresented its product in its marketing brochures and annual reports in violation of the Lanham Act. Id. As amended by

the Trademark Remedy Clarification Act (TRCA), the Lanham Act provides that states are not immune from suit in federal court for violations of the Act. Id. Florida Prepaid claimed, however, that it was immune from suit because the TRCA was enacted pursuant to Congress's Article I power and Congress may not abrogate state sovereign immunity when it legislates under Article I. Id. at 2224. The bank contended that, under Parden, Florida Prepaid had waived its immunity when it engaged in the interstate marketing and administration of its program after the TRCA made it clear that such activity would subject Florida Prepaid to suit. Id. The Court overruled Parden and concluded that Florida Prepaid had not waived its immunity. See id. at 2226-28.

The Court reasoned that it could not "square Parden with [its] cases requiring that a State's express waiver of sovereign immunity be unequivocal." Id. at 2228 (citing Great Northern Life Ins. Co. v. Read, 322 U.S. 47 (1944)). "The whole point of requiring a 'clear declaration' by the State of its waiver is to be certain that the State in fact consents to suit." Id. Where Congress clearly expresses its intention that if a state takes certain action it will waive its immunity, "the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals." Id. However, this "is very far from concluding that the State made an 'altogether voluntary' decision to waive its immunity." Id.

Furthermore, if the Court recognized "a congressional power to exact constructive waivers of sovereign immunity through the exercise of Article I powers," it would thereby "permit Congress to circumvent the antiabrogation holding of Seminole Tribe." Id. at 2229 (emphasis added). "Forced waiver and abrogation are not even different sides of the same coin – they are the same side of the same coin." Id. (emphasis added).[4]

Thus, for a constructive waiver of sovereign immunity to be valid under College Savings Bank, it must be altogether voluntary and not forced from a state by Congress. A constructive waiver is voluntary only where Congress threatens a state with the denial of a "gift or gratuity" if the state refuses to consent to suit in federal court. See id. at 2231. Where Congress threatens a state with a "sanction" if it refuses to consent to suit, then the waiver is no longer freely given. See id. In addition, it may be that the difference between a gift and a sanction disappears when the gift Congress threatens to withhold is large enough. See id.

_____

[4]Defendants contend that College Savings Bank precludes Congress from using its commerce power to obtain a constructive or implied waiver from a state. They therefore argue that because Congress adopted the 1996 Act pursuant to its commerce power, § 252 cannot permissibly require states to constructively or impliedly waive their sovereign immunity. We disagree. The key to constructive or implied waiver under College Savings Bank is the voluntariness of the state waiver, not the particular power pursuant to which Congress enacted the statute. Under College Savings Bank, Congress may not exact or force a waiver from a state pursuant to any of its Article I powers.

-15-

To illustrate its holding in College Savings Bank, the Court distinguished the legitimate conditions Congress placed on states in Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275 (1959), and South Dakota v. Dole, 483 U.S. 203 (1987), from the forced waivers in Parden and the case at bar. In Petty, the Court held that a bistate commission created pursuant to an interstate compact "had consented to suit by reason of a suability provision attached to the congressional approval of the compact." College Sav. Bank, 119 S. Ct. at 2231 (citing Petty). In Dole, the Court held "that Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions." Id. (citing Dole).

The College Savings Bank court explained that the bistate commission's waiver was valid because, under the Compact Clause of the U.S. Constitution, states may not form an interstate compact without the consent of Congress. Id. The granting of consent therefore is a gratuity. Id. Similarly, "Congress has no obligation to disburse funds to the States; such funds are gifts." Id.

In contrast, in both Parden and the case before the Court, Congress did not threaten the denial of a gift or gratuity if the states refused to waive their sovereign immunity. See id. Instead, in both Parden and College Savings Bank, Congress threatened a sanction: "exclusion of the State from otherwise

-16-

permissible activity." Id. Specifically, the federal statute in Parden required Alabama to waive its immunity or give up its ability to own and operate a railroad in interstate commerce. In College Savings Bank, the TRCA required Florida to waive its immunity or give up its ability to engage in the business of advertising and selling a for-profit educational investment vehicle. The voluntariness of a waiver is destroyed "when what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity." Id.; see also Innes, 184 F.3d at 1284 (holding that a state university "knowingly and voluntarily" waived the state's immunity "by agreeing, as a prerequisite to its participation in the Perkins Loan program, to undertake certain enumerated actions in federal bankruptcy court in the event of a claim for discharge filed by the student-borrower").

### 3. Application of College Savings Bank

47 U.S.C.A. § 252 invites states to participate in the federal government's regulation of local telephone service. Congress has clearly expressed its intention that if a state elects to approve or reject an interconnection agreement, then it waives its sovereign immunity. See 47 U.S.C.A. § 252(e)(6) ("In any case in which a State commission makes a determination under [§ 252], any party aggrieved by such determination may bring an action in an appropriate Federal district court . . . ."); see also id. § 252(e)(4) ("No State court shall have

jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.").[5] Thus, § 252 puts Utah on notice that Congress intends to subject it to suits brought by individuals if it acts under § 252. See College Sav. Bank, 119 S. Ct. at 2228. College Savings Bank, however, makes it clear that Congress's intent to effect a waiver is insufficient, standing alone, to render a state's waiver altogether voluntary. Id.

Instead, Utah has voluntarily waived its immunity only if Congress, through the 1996 Act, threatened it with the denial of a gratuity, rather than the imposition of a sanction. Prior to 1996, the states were permitted to regulate local phone service. Indeed, the 1934 Act specifically left regulation of intrastate telephone services to the states. However, the 1996 Act preempted state regulatory authority over some aspects of local phone service. See AT&T Corp., 525 U.S. at 730 n.6 (stating that "[w]ith regard to matters addressed by the 1996 Act," Congress "unquestionably" has "taken the regulation of local telecommunications competition away from the States"). Although it did not do so, Congress could have preempted all state regulation of local phone service. See FERC v.

---

[5]Utah's Governmental Immunity Act provides that "state" "means the state of Utah, and includes any . . . commission." Utah Code Ann. § 60-30-2(9) (Supp. 1999). The UPSC therefore has the authority to act on behalf of Utah and can waive Utah's sovereign immunity. See Innes, 184 F.3d at 1284 (stating that even where a court finds a waiver of state sovereign immunity, it must determine if the waiver is valid by examining whether the defendant had the authority to waive the state's immunity).

-18-

<u>Mississippi</u>, 456 U.S. 742, 764 (1982) ("[T]he commerce power permits Congress to pre-empt the States entirely in the regulation of private utilities."); <u>Hodel v. Virginia Surface Mining & Reclamation Ass'n</u>, 452 U.S. 264, 290-91 (1981).

Thus, with the passage of the 1996 Act, Congress essentially transformed the regulation of local phone service from an otherwise permissible state activity into a federal gratuity. As in <u>Petty</u> and <u>Dole</u>, Congress was under no obligation to allow states to participate in the Act's regulatory scheme. Accordingly, by conditioning a state's ability to regulate local phone service on its consent to suit in federal court, Congress threatened the state with the denial of a gratuity rather than exclusion from an otherwise lawful activity.[6] We therefore hold that Utah

---

[6]Defendants contend that Congress has imposed a sanction on them because if they refuse to consent to suit, Utah will be excluded completely from the regulation of interconnection agreements. They suggest that in this case, the difference between the denial of a gratuity and the imposition of a sanction has disappeared since Congress threatens to withhold such a substantial amount of regulatory authority. Seizing on language in <u>College Savings Bank</u>, they argue that the inducement offered by Congress is "so coercive as to pass the point at which pressure turns into compulsion." 119 S. Ct. at 2231 (internal quotation marks and citations omitted). This argument is without merit.

The size of the "gift" was not at issue in <u>College Savings Bank</u> because "the point of coercion [was] automatically passed" when Congress conditioned participation in an otherwise lawful activity on a state's consent to suit. <u>Id.</u> Thus, the Court's discussion of the coercion theory was merely dicta. <u>See Kansas v. United States</u>, __ F.3d __, 2000 WL 710489, at *6 (10th Cir. June 1, 2000) ("[T]he coercion theory is unclear, suspect, and has little precedent to support its application.").

Moreover, § 252 removes only a slice of regulatory authority from a state if it declines to waive its sovereign immunity. For example, to ensure that barriers to competition will fall, § 253 prohibits all state statutes and regulations that

voluntarily waived its sovereign immunity when the UPSC, through its commissioners, arbitrated the interconnection dispute in this case.[7]  Defendants are subject to suit in federal court, and this case may proceed.

## C. Ex Parte Young

---

impede "the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C.A. § 253(a).  Thus, § 253(a) effectively "strikes down all franchised monopolies that were given by the states to local exchange companies."  Kerf & Geradin, 14 Berkeley Tech. L.J. at 940.  However, § 253(b), captioned "State regulatory authority," contains a broad exception which provides that nothing in § 253 "shall affect the ability of a State to impose, on a competitively neutral basis . . . requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."  Thus, state commissions may continue to regulate telecommunications in the public interest, as long as such regulations are competitively neutral.

[7]The district courts are divided over whether, under College Savings Bank, a state waives its sovereign immunity when it accepts Congress's invitation to participate in the review of interconnection agreements under § 252.  See, e.g., Bell Atlantic-Del., Inc. v. McMahon, 80 F. Supp.2d 218, 231-33 (D. Del. 2000) (finding a waiver); Wisconsin Bell, Inc. v. Public Serv. Comm'n of Wis., 57 F. Supp.2d 710, 714-16 (W.D. Wis. 1999) (finding no waiver).  We are unaware of any circuit court that has decided this issue.  See MCI Telecomms. Corp. v. Illinois Commerce Comm'n, 183 F.3d 558, 564-67 (7th Cir. 1999) (finding a constructive waiver), vacated and reh'g granted, 183 F.3d 567 (7th Cir. 1999) (ordering the parties to file supplemental briefs addressing the applicability of Alden v. Maine, 527 U.S. 706 (1999), College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666 (1999), and Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627 (1999)); see also GTE North, Inc. v. Strand, 209 F.3d 909, 2000 WL 424028, at *12 n.6 (6th Cir. Apr. 20, 2000) (stating in dicta that "it is virtually certain that a state utility commission's decision to accept regulatory authority under the [1996 Act] cannot legitimately be construed as a valid waiver of sovereign immunity" after College Savings Bank and Florida Prepaid).

Even if the Eleventh Amendment barred US West's suit against the UPSC, US West still could proceed with its suit against the individual commissioners. In a suit similar to the one at bar, the Sixth Circuit found that the matter before it was "a straightforward Ex parte Young case." Michigan Bell Tel. Co. v. Climax Tel. Co., 202 F.3d 862, 867 (6th Cir. 2000). We conclude that the instant suit is also a straightforward Ex parte Young case and adopt the Sixth Circuit's rationale and holding:

> The Ex parte Young doctrine operates as an exception to the general rule of sovereign immunity that states may only be sued with their consent. Under Ex parte Young, suits against state officials seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment. Ex parte Young, 209 U.S. at 159-60. The [UPSC] not only approved the interconnection agreement[s], it is responsible for ongoing enforcement of the agreement[s]. [US West] alleges that the agreement[s] violate[] federal law, and is seeking equitable relief [against the commissioners]. . . . Under Ex parte Young, [US West] is entitled to proceed.
> Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996) and Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997), do not affect the application of Ex parte Young to § 252 cases. Recently, the Supreme Court once again affirmed the vitality of Ex parte Young, even while strongly reaffirming states' rights against suit. See Alden v. Maine, 119 S. Ct. 2240, 2266-68 (1999) ([stating that] sovereign immunity does not bar certain actions against state officers for injunctive or declaratory relief).

Id. at 867-68 (parallel citations omitted).[8]  Thus, we hold that under Ex parte Young, the Eleventh Amendment does not bar US West's suit against the individual commissioners.

## V.  US West's Takings Claim

In its first amended complaint, US West claimed that the contractual provisions imposed upon it by the UPSC constitute a taking of its property for public use without just compensation in violation of the Fifth and Fourteenth Amendments.  US West sought relief under 42 U.S.C. § 1983.  Defendants moved to dismiss US West's takings claim under Fed. R. Civ. P. 12(b), and the district court determined that it had jurisdiction over the claim.  On appeal, defendants argue that US West cannot raise its takings claim in federal court until it attempts to obtain compensation through state procedures or pleads that it would be futile

---

[8]Defendants contend that Seminole Tribe and Coeur d'Alene Tribe narrowed the Ex parte Young doctrine so as to make it inapplicable to this case. We have recognized that "Coeur d'Alene Tribe imposes an important additional requirement" upon the application of Ex parte Young.  J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1286 (10th Cir. 1999).  Now, in an Ex parte Young case, "[w]e must examine whether the relief Plaintiff[] seek[s] against the state officials implicates special sovereignty interests, and whether that requested relief is the functional equivalent to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment."  Id. (internal quotation marks and citations omitted).  In this case, US West requests declaratory and injunctive relief to remedy actions by the commissioners which it claims are violations of federal law.  Such relief would not affect any special sovereignty interests or otherwise cause offense to Utah's sovereign authority.  Defendants' argument therefore is without merit.

to do so. They claim that because US West has not yet gone through state channels, the takings claim is not ripe and the district court therefore does not have jurisdiction over it.

We find no indication in the record that defendants made this argument to the district court. Moreover, the district court did not discuss ripeness in its memorandum order denying defendants' motion to dismiss. The lower court merely found that US West brought its claim under the Fourteenth Amendment and 42 U.S.C. § 1983. The district court concluded that "[t]hese are appropriate channels for such claims and this Court has the proper jurisdiction to hear them." Mem. Order at 7. Whether the claim is ripe for judicial review is another question, one that the district court apparently did not address.

We see no reason to "depart from the general rule that 'a federal appellate court does not consider an issue not passed upon below.'" Walker v. Mather (In re Walker), 959 F.2d 894, 896 (10th Cir. 1992) (quoting Singleton v. Wulff, 428 U.S. 106, 120 (1976)). We therefore decline to consider the merits of defendants' ripeness argument. The ripeness issue will be before the district court on remand.

AFFIRMED AND REMANDED.