**WORLDCOM, INC., et al., Plaintiffs,**

**v.**

**CONNECTICUT DEPARTMENT OF PUBLIC UTILITY CONTROL, et al. Defendants.**

**No. CIV.3:00CV1919 CFD.**

United States District Court, D. Connecticut.

Sept. 25, 2002.

Moyahoena N. Ogilvie, Cummings & Lockwood, Hartford, CT, Robert J. Sickinger, Cummings & Sickinger, Stamford, CT, Robert P. Dolian, Cummings & Lockwood, Stamford, CT, Maureen F. Del Duca, Michael B. DeSanctis, Jenner & Block, Washington, DC, for Plaintiffs.

Robert S. Golden, Jr., Tatiana D. Eirmann, Attorney General's Office Public Utility Control, New Britain, CT, for Defendants.

Ralph G. Elliot, Tyler, Cooper & Alcorn, Hrtford, CT, for Defendant.

### RULING ON STATE DEFENDANTS' MOTION TO DISMISS

DRONEY, District Judge.

#### I. *Introduction*

Plaintiffs WorldCom, Inc., Brooks Fiber Communications of Connecticut, Inc., MCI WorldCom Communications, Inc., and MCIMetro Access Transmission Services, LLC (collectively, "WorldCom") bring this action under the Telecommunications Act of 1996, 47 U.S.C. §§ 251–61 (the "Act" or "1996 Act") and its implementing regulations against defendants Connecticut Department of Public Utility Control ("DPUC"), Donald W. Downes, Glenn Arthur, Jack R. Goldberg, Linda J. Kelly Arnold, and John W. Betkowski (collectively, the "Commissioners"), and Southern New England Telephone Company ("SNET").[1] In short, WorldCom seeks review of a DPUC order issued pursuant to the Act. The state defendants have moved to dismiss the action [Doc. # 22] for lack of subject matter jurisdiction. For the foregoing reasons, their motion is denied.

#### II. *Standard*

As stated above, the state defendants move to dismiss this action for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Such motions may be characterized either as factual or facial; the latter "challenges the sufficiency of the jurisdictional facts alleged, not the facts themselves." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 887 n. 15 (2d Cir.1996). Invocation of the Eleventh Amendment in this context constitutes a facial challenge to the complaint. *Bell Atlantic–Pa., Inc. v. Pennsylvania Pub. Util. Comm'n*, 107 F.Supp.2d 653, 659 (E.D.Pa. 2000). Accordingly, the Court will accept WorldCom's allegations as true and construe them liberally. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994). Once challenged, the party asserting jurisdiction-WorldCom-has the burden of proving its existence. *Board of Educ. of the Mt. Sinai Union Free School Dist. v. New York State Teachers Sys.*, 60 F.3d 106, 109 (2d Cir.1995); *Robinson*, 21 F.3d at 507. Because the Court will rely solely on the pleadings and supporting affidavits, WorldCom must make only a prima facie showing of jurisdiction. *Robinson*, 21 F.3d at 507.

#### III. *Background*

##### A. *The 1996 Act*

Until the 1990's, local telephone service was essentially a monopoly. "States typically granted an exclusive franchise in each local service area to a local exchange carrier ("LEC"), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The 1996 Act fundamentally altered this regime. "States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry." *Id.* One of the principal responsibilities of the incumbent LEC is to allow its competitors

---

1. DPUC and the Commissioners together will be referred to as the "state defendants."

to share its network; this sharing is termed "interconnection" in the Act. 47 U.S.C. § 251(c)(2). · It also has the duty to provide to "any requesting telecommunications carrier for the provision of telecommunications service, non-discriminatory access to network elements on an unbundled basis at any technically feasible points on rates, terms and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of section 252 of this title." [2]  *Id.* § 251(c)(3).

When it receives a request for interconnection from a competing telecommunications carrier, the incumbent LEC may negotiate and enter into a binding agreement with the competitor. *Id.* § 252(a). The agreement must contain itemized charges for each service or network element covered by the agreement. *Id.* When negotiating interconnection agreements with its competitors, the incumbent LEC has a duty to act in good faith. *Id.* § 251(c)(1). However, if differences arise, either the incumbent LEC or the competitor may ask the state commission that regulates local service to become involved in the negotiations as a mediator or may petition the state commission to arbitrate any remaining open issues. *Id.* §§ 252(a)(2), (b)(1). Each interconnection agreement, whether adopted by negotiation or arbitration, must be approved by the state commission. *Id.* § 252(e)(1). The state commission has limited grounds on which it may base a rejection of an agreement. *Id.* § 252(e)(2). For example, it may reject an arbitrated agreement if it finds that it does not meet the requirements of § 251 such as the

requirement that the incumbent LEC's rates, terms and conditions for interconnection and unbundled network elements must be "just, reasonable, and nondiscriminatory." *Id.* § 251(c)(2), (3). After the state commission acts,[3] "any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." *Id.* § 252(e)(6).

### B. *The parties*

Plaintiff WorldCom, Inc. offers telephone service in Connecticut through its wholly owned indirect subsidiaries and fellow plaintiffs Brooks Fiber Communications of Connecticut, Inc., MCI WorldCom Communications, Inc., and MCIMetro Access Transmission Services, LLC. Each of the subsidiaries is a telecommunications provider.

Defendant SNET is an incumbent LEC under the meaning of § 252(h)(1) of the Act. Defendant DPUC is a State commission under the Act which has regulatory jurisdiction with respect to intrastate operations of carriers. *Id.* § 153(41). The remaining defendants are commissioners of the DPUC and they are sued only in their official capacities.

### C. *The dispute*

In 1996, SNET, an incumbent LEC, and WorldCom, a requesting telecommunications carrier, engaged in negotiations regarding a proposed interconnection agree-

---

2.  A "network element" is "a facility or equipment used in the provision of a telecommunications service." *Id.* § 153(29). It also includes "features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information

sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service." *Id.*

3.  The Act also contains provisions dealing with situations in which the state commission fails to act. *Id.* § 252(e)(4), (5), (6).

ment. Following a period of negotiations in which the parties were unable to resolve certain issues, WorldCom filed a petition with the DPUC for compulsory arbitration as provided for under the Act. On April 23, 1997, the DPUC issued a final order approving an interconnection agreement between the parties. *See* Compl. Ex. B. Under its terms, the prices of certain unbundled network elements ("UNE") were to be incorporated into the agreement when they were updated, approved and filed in other DPUC proceedings. *See* Ex. C.

While the negotiation and compulsory arbitration of the interconnection agreement between SNET and WorldCom were ongoing, the DPUC was conducting proceedings whereby it would establish a tariff pursuant to which SNET would offer UNEs to telecommunications carriers such as WorldCom. The DPUC issued its final decision on this matter on May 20, 1998. *See* Ex. D. In that decision, the DPUC approved SNET's proposed studies as the basis for setting interim rates for UNEs that SNET provided to competitive local exchange carriers, but it also requested that SNET file additional studies by September 1, 1998.

On August 5, 1997, WorldCom filed a complaint in the United States District Court for the District of Connecticut in which it challenged the interconnection agreement. It later withdrew without prejudice that complaint on February 3, 2000.

In June 1999, however, the Connecticut legislature enacted Public Act 99–222, codified at Conn. Gen.Stat. § 16–247b(b), which provided that "the rates for interconnection and unbundled network elements and any combination thereof shall

be based on their respective forward looking long-run incremental costs, and shall be consistent with the provisions of 47 U.S.C. § 252(d)." On January 3, 2000, SNET submitted cost studies to fulfill the requirements of this statute, which led to hearings in which WorldCom participated.

The DPUC's final decision on the pricing issue was issued on June 29, 2000. *See* Ex. F. It approved most of SNET's proposals, but in WorldCom's view, did not address certain of its objections. WorldCom filed a motion for reconsideration, but that motion was denied. Following the DPUC decision, SNET filed a tariff containing the rates consistent with DPUC's order, which was effective July 1, 2000.

In this action, WorldCom argues that the interconnection agreement with SNET as approved by the DPUC violates the 1996 Act and its implementing regulations because it incorporates the new tariff rates for UNEs set by the DPUC in its June 29, 2000 decision.

## IV  *Discussion*

The state defendants argue that this action should be dismissed because the Court lacks subject matter jurisdiction.[4] Their arguments are twofold. First, they maintain that this action violates the State of Connecticut's immunity under the Eleventh Amendment, as the DPUC is a state agency and thus is immune from suit. Second, they contend that the Commissioners are not subject to suit based upon the principle set forth in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) because WorldCom is not seeking prospective relief. In response, WorldCom argues that the Eleventh Amendment does not bar this action because the state

---

**4.** SNET has indicated that it "takes no position" on whether the state defendants' motion to dismiss should be granted.

has voluntarily and unequivocally waived its immunity from suit. It also maintains that *Ex parte Young* permits this action against the Commissioners, who are sued in their official capacities, because it seeks prospective relief and such an award will not frustrate the remedial scheme enacted with the 1996 Act.

After the parties had submitted their briefs, the United States Supreme Court issued its decision in *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 122 S.Ct. 1753, 1760, 152 L.Ed.2d 871 (2002), which addressed many of the issues in this case. The Court considered but did not decide the issue of whether state utility commissions waive their Eleventh Amendment immunity by participating in the interconnection agreement scheme provided for in the Act. *Verizon Md.*, 535 U.S. at ——, 122 S.Ct. at 1760 ("Whether the Commission waived its immunity is another question we need not decide, because-as the same parties also argue-even absent a waiver, Verizon may proceed against the individual commissioners in their official capacities, pursuant to the doctrine of *Ex parte Young*") (citations omitted). The Court also confirmed that the doctrine of *Ex parte Young* applies to cases brought against state officials pursuant to the 1996 Act, *see id.* Finally, also of relevance here, the Court found that the 1996 Act did not preclude district court jurisdiction under 28 U.S.C. § 1331 to review a state commission's actions that allegedly violate the Act.

### A. Jurisdiction to Review the DPUC's Decision

As a preliminary matter, this Court will consider the potential statutory grounds for asserting jurisdiction over this case.[5] Although the parties have not raised the issue, there is some question as to whether WorldCom seeks review of an interconnection agreement pursuant to § 252(e)(6) of the Act. According to the Complaint, the interconnection agreement between World-Com and SNET incorporates subsequent tariff rates set by SNET through proceedings before the DPUC. In this action, WorldCom challenges those tariff rates as inconsistent with the requirements of the 1996 Act. Thus, it does not object to the incorporation provision itself, but instead disagrees with the underlying rates that were subsequently set and applied to the interconnection agreement. As such, this case does not present a typical challenge to a state commission's approval or rejection of an interconnection agreement as contemplated by § 252(e)(6). Nor was it entirely clear prior to the Supreme Court's *Verizon Md.* decision that jurisdiction would lie under 28 U.S.C. § 1331 if the commission's actions were held to fall outside the scope of § 252(e)(6).

Several circuits have held that § 252(e)(6) confers jurisdiction on federal district courts to review state commission decisions that not only approve or reject an interconnection agreement, but those that interpret and enforce the terms of an interconnection agreement. *See, e.g., Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 208 F.3d 475, 481 (5th Cir.2000); *Illinois Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566, 570 (7th Cir.1999); *Southwestern Bell Tel. Co. v. Brooks Fiber Comm. of Okla., Inc.*, 235 F.3d 493, 497 (10th Cir.2000). In contrast, the Fourth Circuit in *Bell Atlantic Md. v. MCI Worldcom, Inc.*, 240 F.3d 279 (4th Cir.2001), and

---

**5.** While the defendant DPUC challenges this Court's jurisdiction, it does so only on the basis of Eleventh Amendment Immunity (and of *Ex parte Young*'s alleged inapplicability). It does not challenge any of the statutory bases for jurisdiction asserted in the complaint, which include § 252(e)(6) of the 1996 Act and 28 U.S.C. § 1331.

the Supreme Court did not reach the issue in reviewing that decision in *Verizon Md.* *See* 240 F.3d at 307 *vacated on other grounds by* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871. *See also Bellsouth Telecomm., Inc. v. MCImetro Access Transmission Serv., Inc.*, 278 F.3d 1223, 1236 (11th Cir.2002). As WorldCom argues, these cases are distinguishable from the instant action, which does not involve a DPUC order that interprets or enforces its interconnection agreement with SNET.

■ More relevant is the First Circuit's discussion in *Puerto Rico Telephone Company v. Telecommunications Regulatory Board of Puerto Rico*, 189 F.3d 1, 10 (1st Cir.1999). There, the court held that federal jurisdiction was lacking over a part of a state commission's order made after its approval of an interconnection agreement relieving customers of any duty to pay retroactive or "surprise charges" under the agreement. *Id.* at 11–12. However, in reaching this conclusion it explained:

> Nevertheless, § 252(e)(6), which authorizes review in cases in which "a State commission makes a determination under [§ 252]," clearly requires at least a substantial nexus between the commission's determination and an interconnection agreement. The whole subject of § 252 is such agreements—the procedure for putting them into place, the standards for the prices they contain. "[D]etermination" is used elsewhere in § 252 to refer to decisions about the specific provisions of agreements, such as the rates they will specify. *See* § 47 U.S.C. § 252(d)(1) (discussing "[d]eterminations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment").

*Id.* at 10. Here, although the State commission's determination regarding a rate for the network elements at issue was not made as part of an order approving or rejecting the interconnection agreement at issue, that agreement clearly contemplated that future determinations by the DPUC regarding SNET tariffs would be incorporated in the terms of the agreement. This Court concludes that this is a sufficient nexus to support jurisdiction over issues relating to the rates set as a result of the DPUC's June 29, 2000 determination insofar as those rates are a part of the interconnection agreement between SNET and WorldCom.

■ However, even if there is not a "sufficient nexus" to support jurisdiction under § 252(e)(6), this Court has jurisdiction pursuant to 28 U.S.C. § 1331. In *Verizon Md.*, the Court considered the grounds for and scope of district court review under the 1996 Act of state commission action interpreting an existing interconnection agreement, but not relating to either "the approval or disapproval of a negotiated agreement nor the approval or disapproval of a statement of generally available terms." *Verizon Md.*, 535 U.S. at ——, 122 S.Ct. at 1758. The Court addressed the question of whether § 252(e)(6) conferred jurisdiction on the district court to review a state commission's order resolving a dispute over a previously approved interconnection agreement. *Verizon Md.*, 122 S.Ct. at 1756–57. However, the Court did not reach the issue of whether 252(e)(6) provided jurisdiction, instead finding jurisdiction under 28 U.S.C. § 1331:

> [The plaintiffs] argue, however, that a state commission's authority under § 252 implicitly encompasses the authority to interpret and enforce an interconnection agreement that the commission has approved, and that an interpretation is therefore a "determination under [§ 252]" subject to federal review. Whether the text of § 252(e)(6) can be so construed is a question we need not

decide. For we agree with the parties' alternative conclusion, that even if § 252(e)(6) does not *confer* jurisdiction, it at least does not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law. *Id.* The Court thus rejected the reasoning adopted by the Fourth Circuit that § 252(e)(6)'s grant of jurisdiction was intended to limit judicial review under the Act solely to state commission "determinations" pursuant to § 252. Citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Court reasoned that "[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others." *Verizon Md.*, 535 U.S. at ——, 122 S.Ct. at 1759 (internal quotation marks omitted). Thus, while the Court did not specifically address the issue presented here (the review of the tariff rates as they apply to the interconnection agreement), the Court's reasoning extends to the review of tariff rates set by the DPUC under 28 U.S.C. § 1331 "for compliance with federal law." *Id.*

### A. *Eleventh Amendment immunity*

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The Supreme Court has interpreted the Eleventh Amendment to mean that an unconsenting state also is immune from suits brought by its own citizens as well. *See Edelman v. Jordan*, 415 U.S. 651, 652–53, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

Still, an individual may sue a state under limited circumstances. First, Congress may abrogate state immunity and permit such a suit pursuant to its Fourteenth Amendment enforcement powers. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). Second, a state may consent to suit and thereby waive its immunity. *Id.* (citing *Clark v. Barnard*, 108 U.S. 436, 447–48, 2 S.Ct. 878, 27 L.Ed. 780 (1883)). Finally, an individual may sue an officer of the state for prospective injunctive or declaratory relief from an ongoing violation of the Constitution or federal law. *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Ex parte Young*, 209 U.S. at 159–60, 28 S.Ct. 441.

### 1. *Abrogation*

█ As to abrogation, after the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), Congress may not abrogate the states' Eleventh Amendment immunity through the exercise of its powers under Article I. *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 635, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999). Since Congress adopted the 1996 Act pursuant to its Article I commerce power, *see* 47 U.S.C. § 151, "Congress could not and did not abrogate the states' sovereign immunity under the 1996 Act." *MCI Telecomm. Corp. v. Public Serv. Comm'n of Utah*, 216 F.3d 929, 935 n. 3 (10th Cir.2000).

### 2. *Waiver*

█ A "stringent test" is used to determine whether a state has waived its Eleventh Amendment immunity. *McGinty v. New York*, 251 F.3d 84, 92–93 (2d Cir.2001) (internal quotation omitted). A state waives its immunity if it voluntarily in-

vokes federal jurisdiction or if it makes "a clear declaration that it intends to submit itself to federal jurisdiction." *College Savings,* 527 at 675–76, 119 S.Ct. 2219 (citations and quotations omitted). As to the latter form of waiver, the Supreme Court in *College Savings* rejected the idea that a state may constructively waive its immunity merely by being present in a field that is subject to congressional regulation. 527 U.S. at 680, 119 S.Ct. 2219, overruling *Parden v. Terminal Ry. of Ala.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); *Burnette v. Carothers,* 192 F.3d 52, 60 (2d Cir.1999) (concluding that where the plaintiffs argued that "Connecticut consented to suit in federal court under CERCLA by engaging in an activity regulated by Congress, namely the operation of a prison from which toxic chemicals were released," the law is clear after *College Savings* that a state cannot constructively waive its immunity in that manner).

Ruling that such participation is "very far from concluding that the State made an 'altogether voluntary' decision to waive its immunity" the Court concluded that a state waives its sovereign immunity by engaging in activity subject to congressional regulation if (1) Congress clearly and unambiguously puts the state on notice that the state's conduct subjects it to federal suits brought by individuals; (2) the state may refuse from participating in the particular activity without otherwise excluding itself from conduct that is lawfully within its powers; and (3) the state elects to engage in the conduct after it receives notice that such conduct subjects it to suit.

*MCI Telecomm. Corp. v. New York Telephone Co.,* 134 F.Supp.2d 490, 497 (N.D.N.Y.2001) (quoting *College Savings,* 527 U.S. at 675–87, 119 S.Ct. 2219). In other words, if Congress threatens the state with a "sanction" if it refuses to consent to suit, waiver cannot be freely given. *College Savings,* 527 U.S. at 687, 119 S.Ct. 2219. However, a constructive waiver is voluntary where Congress threatens the state only with the denial of a "gift" or "gratuity" if it refuses to consent to suit. *Id.* at 686–87, 119 S.Ct. 2219 (referring to *Petty v. Tennessee–Mo. Bridge Comm'n,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959) and *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) as examples of cases where the consequence of waiver of sovereign immunity was the denial of a gift or gratuity rather than a sanction). Although the state defendants maintain that "there is no room for the constructive waiver of sovereign immunity" after *College Savings,* the Second Circuit has indicated that a state may still waive Eleventh Amendment immunity in this manner, though, as stated above, the test for voluntary waiver is a stringent one. *McGinty,* 251 F.3d at 95.

As explained above, after the state commission acts on a proposed interconnection agreement, "any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). As discussed *infra,* the Supreme Court declined to consider whether a state commission waives its Eleventh Amendment Immunity by participating in the 1996 Act. The Second Circuit similarly has not yet addressed whether a state commission such as the DPUC waives its immunity by agreeing to arbitrate disputes under the Act, though one district court within the circuit has determined that this action by a state waives such immunity. *See MCI Telecomm. Corp.,* 134 F.Supp.2d at 497–99. Of the five circuit courts to have addressed the issue, four similarly

have concluded that a state commission's arbitration of a proposed interconnection agreement constitutes a constructive waiver of that state's sovereign immunity. *See MCI Telecomm. Corp. v. Bell Atlantic–Pa.*, 271 F.3d 491, 513 (3d Cir.2001); *AT & T Comm. v. BellSouth Telecomm. Inc.*, 238 F.3d 636, 646 (5th Cir.2001); *MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 344 (7th Cir.2000), cert. denied 531 U.S. 1132, 121 S.Ct. 896, 148 L.Ed.2d 802 (2001); *MCI Telecomm. Corp. v. Public Serv. Comm'n of Ut.*, 216 F.3d 929, 938–39 (10th Cir.2000), cert. denied 531 U.S. 1183, 121 S.Ct. 1167, 148 L.Ed.2d 1026 (2001); *see also MCI Telecomm. Corp.*, 134 F.Supp.2d at 497 (reaching the same conclusion and collecting district court decisions holding the same). Only one circuit—the Fourth—has reached the opposite conclusion. *See Bell Atlantic Md., Inc. v. MCI Worldcom, Inc.*, 240 F.3d 279, 293–94 (4th Cir.2001), *vacated on other grounds by* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871.

■ As discussed previously, the Supreme Court did not decide this issue in *Verizon Md.* Although the Second Circuit has also not ruled on this issue, this Court finds persuasive the opinions of the majority of circuits to have addressed this issue and concludes that the State of Connecticut has constructively waived its immunity. This conclusion is based on several common principles found in those circuit court decisions.

First, the state was on notice that its participation in the regulatory scheme through its involvement in the acceptance or rejection of interconnection agreements would subject it to suit in federal district court, as § 252(e)(6) clearly indicates that "[i]n any case in which a State commission makes a determination under [§ 252], any party aggrieved by such determination may bring an action in an appropriate

Federal district court." Further, § 252(e)(4) provides that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." Admittedly, the statutes do not specifically state that aggrieved parties may bring suit *against state commissions* in federal district court. However, "consent to federal court review of a decision necessarily entails being made a party to the action." *MCI Telecomm. Corp. v. Bell Atlantic Penn.*, 271 F.3d at 513. Thus, "[a]lthough the language of the statute does not contain the express waiver language that the commission[ ] seek[s], the structure of the pertinent section of the statute, notably 47 U.S.C. § 252 . . . nevertheless makes clear that Congress intended to provide for federal court review of any regulatory determination made under the section, whether by a state commission or, if the state commission chooses not to act, by the FCC acting in its place." *MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d at 341; *see also MCI Telecomm. Corp. v. Bell Atlantic Penn.*, 271 F.3d at 512; *AT & T Comm. v. BellSouth Telecomm. Inc.*, 238 F.3d at 646–47; *MCI Telecom. Corp. v. Public Serv. Comm'n of Ut.*, 216 F.3d at 938.

Second, participation in the resolution of such disputes constitutes a "gift or gratuity" conferred by Congress to which Congress may attach as a condition of waiver of a state's immunity. Although the regulation of local telecommunications had traditionally been within the realm of individual states, the 1996 Act altered this regime. States no longer had an expectation that they alone could engage in such regulation, and "[b]ecause Congress validly terminated the states' role in regulating local telephone competition and, having done so, then permitted the states to resume a role in that process, the re-

sumption of that role by a state is a congressionally bestowed gratuity." *MCI Telecomm. Corp. v. Bell Atlantic Penn.*, 271 F.3d at 510; *see also AT & T Comm. v. BellSouth Telecomm. Inc.*, 238 F.3d at 647; *MCI Telecom. Corp. v. Public Serv. Comm'n of Ut.*, 216 F.3d at 938–39. Thus, "[u]nlike the situation in *Parden* and in *College Savings*, the states are not merely acting in an area regulated by Congress; they are now voluntarily *regulating on behalf of Congress.*" *MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d at 343. Further, as WorldCom points out in its memorandum, at least one state—Virginia—opted not to participate and thus permitted the Federal Communications Commission ("FCC") to resolve open issues encountered by incumbent LECs and requesting telecommunications carriers. *See* 47 U.S.C. § 252(e)(5); 47 C.F.R. §§ 51.803–07. Thus, states may either accept or reject a role in the regulation of interconnection agreements and as a result, their acceptance may be conditioned on a waiver of their sovereign immunity.

Finally, it is clear that the State of Connecticut elected to engage in such regulation, after it received proper notice that doing so would subject it to suit, when it agreed to review the interconnection agreement at issue in this case. *MCI Telecomm. Corp.*, 134 F.Supp.2d at 497. Accordingly, the Court concludes that it has subject matter jurisdiction over WorldCom's claim against the DPUC.

### B. *Ex parte Young*

█ As explained above, *Ex parte Young* provides another "exception to the general rule of sovereign immunity that states may only be sued with their consent." *Michigan Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 867 (6th Cir.2000). Under *Ex parte Young*, suits against state

officials for prospective, injunctive or declaratory relief from an ongoing violation of the Constitution or federal law are not barred by the Eleventh Amendment. *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Ex parte Young*, 209 U.S. at 159–60, 28 S.Ct. 441. Here, the commissioners are sued in their official capacities, and WorldCom alleges that the rates incorporated in the interconnection agreement that they approved violates the 1996 Act, a federal law. Further, because the agreement binds the present and future relations between WorldCom and SNET, the alleged violation is ongoing. *See AT & T Comm. v. BellSouth Telecomm. Inc.*, 238 F.3d at 647. Finally, a declaration from the Court holding that the interconnection agreement violates the 1996 Act would constitute prospective relief.

Nevertheless, the commissioners argue that this action is prohibited under the rule set forth by the Supreme Court in *Seminole Tribe*. The Court ruled that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe*, 517 U.S. at 74, 116 S.Ct. 1114. As WorldCom argues, however, the regulatory scheme that was involved in *Seminole Tribe*, the Indian Gaming Regulatory Act ("IGRA"), was significantly different from the 1996 Act. Under the IGRA, Indian tribes could engage in certain gaming activities only after entering into a compact with the state. The state's obligation to negotiate the compact in good faith was enforceable by the tribe in federal district court. However, the remedies that a court could offer were extremely limited: if the court found the state did not negotiate in good faith, it could order the parties to enter

into a compact within 60 days; if this order was disregarded, the court could require the parties to take part in mediation; finally, if the mediation was unsuccessful, the Secretary of the Interior would issue regulations. *Id.* at 74–75, 116 S.Ct. 1114. In contrast, an IGRA action against a state official under *Ex parte Young* would expose him or her to the full remedial powers of the court. *Id.* at 75, 116 S.Ct. 1114. The Court held that "the fact that Congress chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young* strongly indicates that Congress had no wish to create the latter." *Id.* at 75–76, 116 S.Ct. 1114.

The Supreme Court resolved this controversy in *Verizon Md.* The Court held that the allegation that the state commission's order requiring reciprocal payments was pre-empted by the 1996 Act coupled with the prayer for injunctive relief satisfied the "straightforward inquiry" test for assessing Ex parte Young's applicability established in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). *Verizon Md.*, 535 U.S. at ——, 122 S.Ct. at 1760. In reaching this conclusion, the Court acknowledged that "a declaration of the *past* as well as of the *future* ineffectiveness of the Commission's action" would result in past financial liability. *Id.* However, the Court still found *Ex parte Young* applicable because any such liability affected only private parties, and "no past liability of the state, or any of its commissioners, is at issue." *Id.* (citing *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).

The Court also distinguished *Seminole Tribe.* The Court reasoned that the 1996 Act, unlike the Indian Gaming Regulatory Act at issue in *Seminole Tribe*, does not

"display any intent to foreclose jurisdiction under *Ex parte Young*" *Id.* at 1760. The Court further responded to defendant's assertion that § 252(e)(6) of the 1996 Act constituted an exclusive remedial scheme analogous to the one the Court had found in the Indian Gaming Regulatory Act:

> That section [252(e)(6)] provides only that when state commissions make certain "determinations," an aggrieved party may bring suit in federal court to establish compliance with the requirements of §§ 251 and 252. Even with regard to the "determinations" that it covers, it places no restriction on the relief a court can award.... The mere fact that Congress has authorized federal courts to review whether the Commission's action complies with §§ 251 and 252 does not without more "impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young*.

*Id.* Thus, contrary to the state defendants' contention, *Seminole Tribe* does not preclude WorldCom's suit against the commissioners based on *Ex parte Young*.

## V.  *Conclusion*

For the foregoing reasons, the state defendants' motion to dismiss [Doc. # 22] is DENIED.